[No. C021592. Third Dist. Sept. 25, 1997.]

216 SUTTER BAY ASSOCIATES, Plaintiff and Appellant, v. COUNTY OF SUTTER et al., Defendants and Respondents

COUNSEL

McCutchen, Doyle, Brown & Enersen, Stephen L. Kostka, Marie A. Cooper and Rajiv S. Parikh for Plaintiff and Appellant.

Antonio Rossmann, Darrell W. Larsen, Ronald S. Erickson and Joseph P. Cerullo for Defendants and Respondents.

OPINION

DAVIS, J.—This appeal arises from a controversial land development proposal, a proposal that envisioned four new towns sprouting from twenty-five thousand acres of farmland in southern Sutter County. The proposal engendered not only grand visions but also grand drama. The drama unfolded as a lame-duck board of supervisors (the old Board) approved development agreements for the proposal, while a referendum on the proposal and a newly elected board of supervisors critical of it (the new Board) stood in the wings.

The matter to be resolved on appeal is whether the new Board acted legally in canceling the development agreements. The trial court thought so, ruling in the new Board's favor in demurrer proceedings that involved the cancellation ordinances and in summary judgment proceedings that involved

alleged violations of the open meeting law, the Ralph M. Brown Act (the Brown Act).

BACKGROUND

Sutter County (Sutter County or the County) has only two incorporated cities—Yuba City and Live Oak—and a population of around sixty-five thousand. The County's economy is largely agricultural and its economic development has consistently lagged behind other counties in the Sacramento metropolitan area.

Against this backdrop, the County's board of supervisors in 1988 began studying the possibility of new or expanded communities in the southern portion of the County.

In 1989, the County's board of supervisors began work on a south Sutter general plan amendment study (GPA Study) and an accompanying environmental impact report (EIR). The GPA Study and the EIR evaluated the potential for new communities in south Sutter County.

From the GPA Study and the EIR emerged a proposed south Sutter County general plan amendment (the South Sutter GPA or the GPA). The proposed South Sutter GPA contemplated the development of a community in south Sutter County comprised of four towns (identified for planning purposes as Riego, College Park, Rincon, and Pleasant Grove) that encompass a balance of land uses and a population of one hundred forty thousand.

After a series of public meetings in September and December of 1991, the County's board of supervisors (the old Board) on December 18, 1991, amended the Sutter County general plan with the South Sutter GPA.

Opponents of the South Sutter GPA then collected enough signatures to refer the GPA to a vote of the people. After some initial reluctance, the old Board in October 1992, directed that the referendum be presented to the voters at a special election on June 8, 1993. The referendum, designated "Measure M," posed the following question: "Shall Section IX. TOWN DESCRIPTIONS on pages 3-19 through 3-30 of the South Sutter [GPA] become effective [these town descriptions described all four towns, including their land uses and population projections]?"

Meanwhile, supervisorial elections had taken place in June of 1992. Two of the three supervisors (of the old Board) who had voted to amend the county general plan with the South Sutter GPA were defeated in that election

by defendants Dick Akin and Cornelis Kroon, both of whom had promised to hold the line on development until the people had voted on the GPA; the third supervisor chose not to seek reelection.

As scheduled, the new Board would take office at noon on January 4, 1993. On December 8, 15, and 22 of 1992, the old Board approved 18 development agreements based on the South Sutter GPA. For good measure, the old Board approved another development agreement on the morning of January 4, just hours before leaving office. These 19 development agreements covered virtually the entire South Sutter GPA area. (The state planning and zoning law authorizes local governments to enter into development agreements, which, unless otherwise provided in the agreement, make applicable those land-use regulations that are in force when the agreement was executed. [Gov. Code, §§ 65864, 65865.4, 65866; see Manaster & Selmi, 4 Cal. Environmental Law and Land Use Practice (1997) Zoning and Other Controls, § 60.140, p. 60-161].) The development agreement for the plaintiff in this case, 216 Sutter Bay Associates, was approved on December 15, 1992, as development agreement No. 92-05, Ordinance No. 1152.

In late December 1992, defendant Peter Licari (a member of the old and new Boards), together with defendants Akin and Kroon (who were simply supervisors-elect of the new Board at that point), met with Attorney Brenton Bleier to discuss what could be done regarding the development agreements. Time was of the essence. The development agreements approved on December 8, 1992, would become effective and vest on January 7, 1993 (i.e., 30 days later). (Gov. Code, §§ 65867.5 [a development agreement must be approved by ordinance], 25123 [a development agreement ordinance becomes effective 30 days from date of final passage].)

The new Board called a special meeting for January 5, 1993, which continued to January 6. Before a crowd of some 200 persons, including plaintiff's representatives and representatives of other landowners and developers whose development agreements were in issue, the new Board adopted an interim urgency zoning ordinance (Ordinance No. 1170) "repealing" the development agreements and their accompanying ordinances. (Gov. Code, § 65858.) During a reconvened regular meeting on January 6, the new Board also adopted an "ordinary" urgency ordinance (Ordinance No. 1171) as a parallel "repeal" of the development agreements and their corresponding ordinances. Finally, on February 2, 1993, the new Board adopted a regular ordinance (Ordinance No. 1173), which was essentially a nonurgent version of Ordinance No. 1170.

On February 23, 1993, the new Board directed that the following "advisory vote only" question be put before the people as "Measure U" at the June

8, 1993, scheduled special election: "Do you approve of the South Sutter [GPA] adopted by the Board of Supervisors in December of 1991?" This measure received the following vote: Yes—5,388; No—9,408. "Measure M," asking the electorate if the descriptions of the four new towns in the South Sutter GPA should become effective, met a similar fate: Yes—5,589; No—9,336.

In March of 1993, plaintiff 216 Sutter Bay Associates and two other developers sued defendants Sutter County, the new Board, and three members of the new Board—Akin, Kroon and Licari. (Licari passed away on May 7, 1994.) In a third amended petition for writ of mandate and complaint, plaintiffs asked that Ordinance Nos. 1170, 1171 and 1173 be nullified. The third amended petition and complaint alleged a variety of legal theories but its basic thrust was that the new Board violated the Brown Act as well as statutes governing urgency ordinances and development agreement cancellation.

The trial court sustained the defendants' demurrer without leave to amend as to all causes of action, except for the Brown Act cause of action. Later, the trial court granted defendants a summary judgment after granting their motion for summary adjudication regarding the Brown Act claim.

Only plaintiff 216 Sutter Bay Associates has appealed.

DISCUSSION

1. *The Demurrer Proceedings*

A general demurrer challenges only the legal sufficiency of the complaint, not the truth or the accuracy of the complaint's factual allegations or the plaintiff's ability to prove those allegations. (*Amarel* v. *Connell* (1988) 202 Cal.App.3d 137, 140 [248 Cal.Rptr. 276].) We therefore treat as true all of the complaint's material factual allegations, but not contentions, deductions or conclusions of fact or law. (*Id.* at p. 141; *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

On appeal, plaintiff is not concerned with the sustained demurrer as to three causes of action: the fourth cause of action concerning the California Environmental Quality Act (CEQA); the eighth cause of action for injunctive relief regarding a conflict of interest concerning the County's outside counsel; and the ninth cause of action concerning the transfer of development credits. We deem as waived any claim of error regarding the sustained demurrer to these three causes of action. (*Aragon-Haas* v. *Family Security*

*Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 241 [282 Cal.Rptr. 233].) The first cause of action alleges the Brown Act violation, which we consider in the next section of this opinion. That leaves the second, third, fifth, sixth and seventh causes of action, which we now consider in turn.

### Second Cause of Action

The second cause of action seeks a peremptory writ of mandate directing the defendants to nullify Ordinance No. 1170, the interim urgency zoning ordinance.

Plaintiff alleges that defendants failed to comply with the state planning and zoning law, as embodied in Government Code section 65858, in enacting Ordinance No. 1170. (All further references to undesignated statutory sections are to the Government Code unless otherwise indicated.)

Section 65858 provides in pertinent part: "(a) Without following the procedures otherwise required prior to the adoption of a zoning ordinance, the legislative body, to protect the public safety, health and welfare, may adopt as an urgency measure an interim ordinance prohibiting any uses which may be in conflict with a contemplated general plan, specific plan, or zoning proposal which the legislative body, planning commission or the planning department is considering or studying or intends to study within a reasonable time. That urgency measure shall require a four-fifths vote of the legislative body for adoption. The interim ordinance [unless extended] shall be of no further force and effect 45 days from its date of adoption. . . . [¶] . . . [¶] (c) The legislative body shall not adopt or extend any interim ordinance pursuant to this section unless the ordinance contains a finding that there is a current and immediate threat to the public health, safety, or welfare, and that the approval of additional subdivisions, use permits, variances, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning ordinance would result in that threat to public health, safety, or welfare."

Specifically, plaintiff alleges that defendants enacted Ordinance No. 1170 without first identifying the contemplated general plan or land-use measure which the legislative body or its planning entities was considering or studying or intending to study within a reasonable time. (§ 65858, subd. (a).) Moreover, says plaintiff, defendants failed to make proper findings of a current and immediate threat to the public health, safety or welfare. (§ 65858, subd. (c).) Plaintiff also alleges that defendants failed to find that approval of additional entitlements for land-use development contemplated by the development agreement ordinances would result in that threat to the public health, safety or welfare. (§ 65858, subd. (c).)

We conclude that in enacting Ordinance No. 1170, the new Board made findings that satisfy the section 65858 finding requirements. Where the ordinance recites facts that constitute the urgency and those facts may reasonably be held to constitute an urgency, the courts will neither interfere with nor determine the truth of those facts. (*Crown Motors* v. *City of Redding* (1991) 232 Cal.App.3d 173, 179 [283 Cal.Rptr. 356].)

The new Board addressed the contemplated general plan finding. (§ 65858, subd. (a).) In enacting Ordinance No. 1170, it stated: "The Ordinances and the Development Agreements, collectively and individually, provide for uses which may be in conflict with contemplated general plan proposals, including an amendment to the Sutter County General Plan involving land described by Resolution No. 91-196 [the South Sutter GPA] and land described by each of the Development Agreements, specific plan proposals, and zoning proposals which the Board of Supervisors is considering, is studying, and intends to study further." In making this finding, the new Board had in mind the pending referendum on the South Sutter GPA, which could have affected that GPA. The first development agreements based on the South Sutter GPA were slated to vest on January 7. (See §§ 65865.4, 65866.) Ordinance No. 1170 was part of a procedure to maintain the relevance of the referendum on the South Sutter GPA.

As for the finding of a current and immediate threat to the public health, safety or welfare, the new Board stated: "Were the Ordinances and Development Agreements to become effective, they, individually and collectively, would immediately threaten and jeopardize the public peace, health, safety and welfare in that they could alter—in a radical and fundamental manner— the current way of life for Sutter County residents. The peaceful and largely pastoral quality of life in Sutter County could be dramatically affected by the Ordinances and Development Agreements before the electorate of Sutter County would have an opportunity to give direction on the future direction of land use in the County. The Ordinances and Development Agreements, if effective, could also severely restrict the future exercise of the County's constitutional police power and the statutory discretion of the Board of Supervisors. In such event, the ability of the Board of Supervisors to provide for the public peace, health, safety and welfare will thereby be immediately threatened. There is a current and immediate threat to the public health, peace, safety and welfare." These facts "may reasonably be held to constitute" an urgency. (See *Crown Motors* v. *City of Redding, supra,* 232 Cal.App.3d at pp. 178-179 [where the court upheld an urgency ordinance prohibiting electronic reader boards under the public health rubric of a similar statute, § 36937, subd. (b); the court stated: "[w]e see no reason to restrict from [the] broad powers [a city council has to enact ordinances to

maintain the public health] . . . the power of the city council to advance the quality of life in the community by eliminating visual blight"].)

Moreover, the new Board found that additional land use approvals contemplated by the development agreements would result in this threat to the public health, safety and welfare: "The approval or adoption of additional subdivisions, use permits, variances, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning ordinance on the land intended to be subject to the Ordinances and Development Agreements would result in a threat to public health, safety and welfare."

Thus, in enacting Ordinance No. 1170, the new Board satisfied the finding requirements specified in section 65858.

On appeal, plaintiff switches its section 65858 gears somewhat. Instead of focusing on findings, plaintiff argues that the general purpose of section 65858 is to preserve the status quo, which plaintiff equates with the existence of the development agreements; plaintiff also argues that an interim urgency zoning ordinance authorized under section 65858 cannot be used to *repeal* the development agreement ordinances.

The general purpose of section 65858 is to allow a local legislative body to adopt interim urgency zoning ordinances prohibiting land uses that may conflict with a contemplated general plan amendment or another land use measure proposal which the legislative body is studying or intends to study within a reasonable period of time. (§ 65858, subd. (a); *Bank of the Orient* v. *Town of Tiburon* (1990) 220 Cal.App.3d 992, 996 [269 Cal.Rptr. 690]; *CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 314-315 [118 Cal.Rptr. 315] [such ordinances are within the police power].) Ordinance No. 1170 aligns with this general purpose. It acts to prevent the vesting of the development agreements in light of the pending referendum on the South Sutter GPA, which is the foundation for those development agreements.[1]

The plaintiff's view of the status quo is askew. The plaintiff's development agreement was *not* in existence when Ordinance No. 1170 was enacted on January 6, 1993. Under the terms of the development agreement and the law, the plaintiff's development agreement did not take effect until January 14, 1993, 30 days after the ordinance approving it was enacted (the plaintiff's development agreement ordinance was enacted on December 15,

[1]The term "legislative body" in section 65858 includes the elected legislative body as well as the electorate. (See *Bank of the Orient* v. *Town of Tiburon, supra,* 220 Cal.App.3d at pp. 999-1004.)

1992). (See § 8 of plaintiff's development agreement ordinance ["This ordinance shall be in full force and effect thirty (30) days after its adoption. The effective date of the Development Agreement shall be the effective date of this ordinance"]; §§ 65867.5, 25123 [development agreements must be approved by an ordinance, and ordinances become effective 30 days from the date of final passage]; see *Gilmore* v. *Pearson* (1925) 71 Cal.App. 284, 287 [235 P. 665] [until an ordinance goes into effect, it is not a law and has no force for any purpose]; see also *People* v. *Righthouse* (1937) 10 Cal.2d 86, 88 [72 P.2d 867].) Thus, when Ordinance No. 1170 was enacted on January 6, 1993, the status quo consisted of development agreements that had not yet taken effect but were based on the South Sutter GPA, and a referendum vote on the South Sutter GPA slated for June 1993.

As part of its status quo argument, the plaintiff also looks to the section 65858 language that the "legislative body shall not adopt . . . any interim [urgency zoning] ordinance . . . unless the ordinance contains a finding . . . that the approval of additional subdivisions, use permits, variances, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning ordinance would result in that threat to the public health, safety, or welfare." (§ 65858, subd. (c).) Plaintiff argues that nothing "additional" is involved here, as the development agreements had already been approved when Ordinance No. 1170 was enacted. But development agreements calling for the urbanization of 25,000 acres of farmland will surely contemplate the approval of additional subdivisions, building permits and other applicable entitlements for land use that result in the threats to the public health, safety and welfare identified in Ordinance No. 1170.

The plaintiff's "repeal" argument does not fare any better. Plaintiff argues that an interim urgency zoning ordinance such as Ordinance No. 1170 cannot repeal a development agreement ordinance. According to this argument, the procedure for repealing a development agreement ordinance must be equivalent to the procedure for enacting such an ordinance. This argument is based on sections 65867, 65867.5, and 65868. Section 65867 sets forth the notice and hearing requirements to enact a development agreement ordinance. Section 65867.5 specifies that a development agreement is a legislative act that must be approved by ordinance and is subject to referendum. And section 65868 specifies that a development agreement may be amended or canceled by mutual consent.

Plaintiff notes that the procedure for enacting an interim urgency zoning ordinance (which purports to repeal a development agreement ordinance) does not equate to the procedure for enacting a development agreement

ordinance (cf. §§ 65858, 65867). Nor does an interim urgency zoning ordinance meet the other potential avenues of repeal, such as a referendum (§ 65867.5) or a mutual amendment or cancellation (§ 65868). Plaintiff contends that a development agreement (and its accompanying ordinance) vests after 30 days, if no referendum has been instituted and no mutual amendment or cancellation has taken place. (*Ibid.*)

The flaw in this argument is that Ordinance No. 1170 did not "repeal" the development agreement ordinances, although it said it did. We have to look at what Ordinance No. 1170 actually did in the context of what it legally could do, rather than how it is labeled. As an interim urgency zoning ordinance, Ordinance No. 1170, together with Ordinance No. 1171 (a valid "ordinary" urgency ordinance—more on this ordinance later), preserved the status quo until Ordinance No. 1173 was enacted. (§ 65858, subd. (a).) As we have explained, that status quo consisted of not-yet-effective development agreements (and their ordinances) and a pending referendum on the general plan foundation for those agreements (and ordinances). Ordinance Nos. 1170 and 1171 thus prevented the development agreements (and their accompanying ordinances) from becoming effective until a regular ordinance, Ordinance No. 1173, was passed on February 2, 1993, and became effective. (§ 65858, subd. (a).) Plaintiff does not allege that Ordinance No. 1173, which actually repealed the development agreement ordinances, failed to meet the procedure for enacting a development agreement ordinance. In this way, Ordinance Nos. 1170 and 1171, followed by Ordinance No. 1173, landed the classic "one-two punch," with Ordinance No. 1173 delivering the knockout blow of repeal.

As noted, "[a] development agreement is a legislative act which shall be approved by ordinance . . . ." (§ 65867.5.) ■ It is established that a local legislative body can rescind legislative acts at any time until the act is complete, provided that vested rights are not violated and that such rescission conforms to the rules for the government of the body. (*DeWitt* v. *Board of Supervisors* (1960) 53 Cal.2d 419, 424 [2 Cal.Rptr. 1, 348 P.2d 567]; *Vernon* v. *Board of Supervisors* (1904) 142 Cal. 513, 515-516 [76 P. 253]; *Clark* v. *Patterson* (1977) 68 Cal.App.3d 329, 334 [137 Cal.Rptr. 275].) That is what happened here.

■ Ordinance No. 1170, in conjunction with Ordinance No. 1171 and 1173, operated to rescind the legislative acts encompassing plaintiff's development agreement. That development agreement was not complete at the time of the rescission. Nor had any rights vested under that development agreement at the time of rescission. (See Gov. Code, §§ 65865.4, 65866, 65867.5, 25123 and § 8 of the plaintiff's development agreement ordinance;

see also *Gilmore* v. *Pearson, supra,* 71 Cal.App. at p. 287.) As we have explained, the new Board acted legally in adopting Ordinance No. 1170 (and, as we explain in the next section of this opinion, acted legally in adopting Ordinance Nos. 1171 and 1173).[2]

We conclude that Ordinance No. 1170 is not invalid under the state planning and zoning law. We conclude therefore that the trial court properly sustained without leave to amend the defendants' demurrer to the plaintiff's second cause of action that sought 1170's nullification on this basis.

### Third. Cause of Action

The third cause of action alleges that the new Board invalidly enacted Ordinance Nos. 1170 and 1171 (collectively referred to in the third amended complaint as "Actions of the Board") as well as Ordinance No. 1173, under the state development agreement law. (§ 65864 et seq.) This cause of action seeks a writ of mandate directing the board of supervisors to nullify Ordinance No. 1173.

Again, plaintiff's basic thrust is that urgency ordinances like Ordinance Nos. 1170 and 1171 cannot be used to repeal a development agreement ordinance because the procedure for repealing a development agreement ordinance must mirror the procedure for enacting a development agreement ordinance. In the preceding section of this opinion, we concluded that Ordinance Nos. 1170 and 1171 merely preserved the status quo while Ordinance No. 1173 actually repealed plaintiff's development agreement and its accompanying ordinance.[3]

In its argument regarding the third cause of action, the plaintiff also raises specific points regarding Ordinance No 1171 in an attempt to undercut the foundation of Ordinance No. 1173.

---

[2]One land-use law commentator has noted that the "legislative act" and "referendum" provisions of section 65867.5 ("A development agreement is a *legislative act* which shall be approved by ordinance and is subject to *referendum*" [italics added]) were placed in the statute "to avoid such problems as a 'lame duck' city council approving a development agreement opposed by the people." (Storm, 1982 Zoning and Planning Law Handbook, Development Agreements, § 11.03[7], p. 185.)

[3]Although plaintiff alleges in the third cause of action that the new Board had the duty and ability to provide proper notice and hearing in repealing plaintiff's development agreement ordinance (with Ordinance No. 1173), plaintiff does not allege that the new Board failed to meet this duty. This is confirmed by the plaintiff's argument on appeal regarding the alleged invalidity of Ordinance No. 1173. The substance of that argument, in its entirety, reads as follows: "[Plaintiff's] development agreement ordinance was adopted on December 15. Since it was not repealed by Ordinances 1170 and 1171, it became effective 30 days later. Once it became effective, defendants clearly had no right to unilaterally repeal the development agreement ordinance—the rights under the agreement indisputably were vested by that time. See Government Code §§ 65865.4, 65866. Accordingly, the complaint stated a cause of action for invalidation of Ordinance 1173 and the trial court also erred in dismissing this claim."

Ordinance No. 1171 was enacted as an "ordinary" urgency ordinance. Ordinary urgency ordinances are governed by sections 25123, subdivision (d), and 25131.

Under section 25123, subdivision (d), ordinary urgency ordinances must "contain a declaration of the facts constituting the urgency." Plaintiff challenges the adequacy of the declaration of facts supporting Ordinance No. 1171. That declaration of facts, however, is similar to the declaration of facts supporting Ordinance No. 1170, speaking passionately about the threat to Sutter County's pastoral way of life. In the preceding section of this opinion, we concluded that the declaration of facts supporting Ordinance No. 1170, an interim urgency zoning ordinance, was sufficient for purposes of demurrer review. A similar legal standard applies to ordinary urgency ordinances. (See §§ 25123, subd. (d) [ordinary urgency ordinances seek the "immediate preservation of the public peace, health, or safety"], 65858, subd. (c) [interim urgency zoning ordinances require a "current and immediate threat to the public health, safety, or welfare"].) For similar reasons, we conclude that the declaration of facts supporting Ordinance No. 1171 is sufficient for demurrer purposes.

Plaintiff also points to section 25131. That section specifies that ordinary urgency ordinances "may be passed immediately upon introduction and either at a regular or special meeting." It also cautions that it does "not apply to ordinances which by statute can be passed only after notice and a public hearing." Plaintiff seizes upon this cautionary language, notes that a development agreement ordinance can be passed only after notice and a public hearing (§ 65867), and argues that an urgency ordinance like Ordinance No. 1171 therefore cannot operate in the development agreement arena.

The provision in section 25131 regarding notice and hearing is to ensure that regular ordinances are not enacted simply as urgency ordinances, bypassing more formal notice and hearing requirements. No such action was taken here. Urgency ordinances, by their nature, are enacted in light of an urgency that does not allow for the more formal notice and hearing requirements for regular ordinances to be met. Urgency ordinances contemplate a situation where action must be taken immediately to preserve the public peace, health or safety (in the case before us, action to keep the development agreements from vesting). (§§ 25123, subd. (d), 25131.) Under the plaintiff's argument, urgency ordinances could never cover any matter addressed by a statute calling for notice and hearing. In large part, that would dispense with urgency ordinances. That is not, and cannot be, the law.

The statutory language at issue prevented Ordinance No. 1171, the urgency ordinance, from being used to serve as a regular ordinance. Ordinance

No. 1171 addressed an urgency, and that was it. The new Board did not attempt to enact a regular ordinance in the guise of an urgency ordinance. Rather, the new Board subsequently enacted Ordinance No. 1173, which was adopted in the regular notice and hearing fashion.

We find that Ordinance Nos. 1170, 1171 and 1173 are not invalid under the state development agreement law or under the statutes authorizing urgency ordinances. (§§ 65864 et seq., 25123, 25131.) The trial court, therefore, properly sustained without leave to amend the defendants' demurrer to the plaintiff's third cause of action that sought Ordinance No. 1173's nullification on these bases.

*Fifth Cause of Action*

The fifth cause of action alleges that defendants violated the plaintiff's civil rights by depriving it of procedural and substantive due process. The cause of action seeks declaratory and injunctive relief.

The procedural due process claim is that the new Board failed to provide adequate notice of the special meeting at which Ordinance No. 1170 was adopted. On appeal, plaintiff states it is not contesting the trial court's adverse ruling on this point.

The substantive due process claim is that the enactment of Ordinance Nos. 1170, 1171 and 1173 was "arbitrary, unreasonable and a clear abuse of discretion, having no substantial relationship to the public health, safety, peace, morals or general welfare." We have rejected the substance of this argument in our discussion of the findings supporting Ordinance Nos. 1170 and 1171.

We conclude the trial court properly sustained without leave to amend the defendants' demurrer to the fifth cause of action.

*Sixth Cause of Action*

This cause of action is for declaratory relief. Plaintiff seeks a declaration that the enactment of Ordinance Nos. 1170, 1171 and 1173 violated the Brown Act, the state planning and zoning law, the state development agreement law, CEQA, and the due process clauses of the state and federal Constitutions.

Plaintiff has not raised any issues regarding the demurrer order dismissing the CEQA cause of action, and has therefore waived any claim of error in

that regard. (*Aragon-Haas* v. *Family Security Ins. Services, Inc, supra*, 231 Cal.App.3d at p. 241.)

In the preceding sections of this opinion we have dealt with the causes of action based on the other laws cited immediately above, except for the cause of action based on the Brown Act. As we shall explain later, the trial court properly granted summary adjudication on the Brown Act cause of action.

Thus, we conclude the trial court properly sustained without leave to amend the defendants' demurrer to the plaintiff's sixth cause of action.

### Seventh Cause of Action

The seventh cause of action alleges that defendants breached the covenant of good faith and fair dealing implied in plaintiff's development agreement by enacting Ordinance Nos. 1170, 1171 and 1173. We have concluded that plaintiff's development agreement (and its implied covenant of good faith and fair dealing) was repealed before it became effective. Therefore, this implied covenant could not be breached.

We conclude the trial court properly sustained without leave to amend the defendants' demurrer to the plaintiff's seventh cause of action.

### 2. The Summary Adjudication/Summary Judgment Proceedings

Plaintiff claims the trial court erred in granting summary adjudication on its cause of action alleging a violation of the Brown Act (plaintiff's first cause of action), and in entering summary judgment against plaintiff based on the demurrer and summary adjudication rulings. We disagree.

A party may move for summary adjudication of a cause of action if that party contends the cause of action has no merit. (Code Civ. Proc., § 437c, subd. (f)(1); hereafter, section 437c.) A defendant moving party meets its burden of showing that a cause of action has no merit if it shows that one or more elements of the cause of action cannot be established. (§ 437c, subd. (o)(2).) To do this, a moving party may note that discovery has disclosed no evidence to support one or more elements of the cause of action. (See *Rio Linda Unified School Dist.* v. *Superior Court* (1997) 52 Cal.App.4th 732, 735 [60 Cal.Rptr.2d 710]; *Hunter* v. *Pacific Mechanical Corp.* (1995) 37 Cal.App.4th 1282, 1286-1287 [44 Cal.Rptr.2d 335]; *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 590 [37 Cal.Rptr.2d 653].) A motion for summary adjudication shall be granted if all the papers submitted show that there is no triable issue as to any material fact regarding the cause of action

and that the moving party is entitled to adjudication as a matter of law. (See § 437c, subd. (c).)

In its Brown Act cause of action, plaintiff alleged four violations of the act: (i) defendants failed to give proper notice for the January 5 and 6, 1993, special meetings; (ii) the new Board met improperly in closed sessions; (iii) defendants improperly added Ordinance No. 1171 to the agenda of the January 6, 1993, regular meeting; and (iv) the defendants Licari, Akin and Kroon violated the open meeting aspect of the Brown Act by conducting private meetings in December 1992, and agreeing to agree to enact Ordinance Nos. 1170 and 1171, and by conducting private meetings after they became supervisors on January 4, 1993, and reaching collective agreements on modifications to documents that constituted part of the "invalidation plan" regarding plaintiff's development agreement and accompanying ordinance.

On appeal, the only alleged violation that remains for summary adjudication review is (iv). In its opening appellate brief, the plaintiff states that it is not contesting the trial court's rulings on alleged violations (i) and (ii). Any issue regarding alleged violation (iii) is waived for failure properly to brief it under a separate heading. (Cal. Rules of Court, rule 15(a); *Live Oak Publishing Co.* v. *Cohagan* (1991) 234 Cal.App.3d 1277, 1291 [286 Cal.Rptr. 198].) Furthermore, plaintiff failed to submit a section 437c, subdivision (b), statement of material facts regarding alleged violations (i) through (iii), failed to submit any evidence on those issues, and conceded it was not disputing the defendants' section 437c, subdivision (b), statement on these points.

That brings us to alleged violation (iv)—the self-described crux of plaintiff's Brown Act cause of action. This contention alleges that Licari, Akin and Kroon violated the Brown Act's open meeting requirement by holding a series of private meetings with the Bleier law firm. At this point, it is helpful to set forth the Brown Act principles at play here.

Under the Brown Act, "[a]ll meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend," except as otherwise provided by the act. (§ 54953.) It is the expressed intent of the Brown Act that the local legislative body both act and deliberate openly. (§ 54950.)

■ Thus, "the Brown Act . . . is not limited to gatherings at which action is taken by the relevant legislative body; 'deliberative gatherings' are included as well. (*Sacramento Newspaper Guild* [v. *Sacramento County Bd.*

*of Suprs.* (1968)] 263 Cal.App.2d [41,] at p. 48.) Deliberation in this context connotes not only collective decisionmaking, but also 'the collective acquisition and exchange of facts preliminary to the ultimate decision.' (*Id.*, at pp. 47-48; *Rowen* v. *Santa Clara Unified School Dist.* (1981) 121 Cal.App.3d 231, 234 [175 Cal.Rptr. 292] . . . .)" (*Frazer* v. *Dixon Unified School Dist.* (1993) 18 Cal.App.4th 781, 794 [22 Cal.Rptr.2d 641], citations omitted.)

To prevent evasion of the Brown Act, a series of private meetings (known as serial meetings) by which a majority of the members of a legislative body commit themselves to a decision concerning public business or engage in collective deliberation on public business would violate the open meeting requirement. (See *Stockton Newspapers, Inc.* v. *Redevelopment Agency* (1985) 171 Cal.App.3d 95, 102 [214 Cal.Rptr. 561]; *Frazer* v. *Dixon Unified School Dist.*, *supra*, 18 Cal.App.4th at p. 795; see also *Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 376 [20 Cal.Rptr.2d 330, 853 P.2d 496].)[4]

The Brown Act contains a variety of remedies for violation: a criminal misdemeanor penalty against legislative body members; mandamus, injunctive and declaratory relief; and nullification of an "action taken" by a legislative body in violation of the act. (§§ 54959, 54960, 54960.1.) "Action taken" is defined in the Brown Act to mean "a collective decision made by a majority of the members of a legislative body [an agreement on a decision], a collective commitment or promise by a majority of the members of a legislative body to make a positive or a negative decision [an agreement to agree on a decision], or an actual vote by a majority of the members of a legislative body . . . ." (§ 54952.6.)

■ Plaintiff's alleged violation (iv) is composed of two prongs and seeks the nullification of Ordinance Nos. 1170 and 1171. These two prongs are set forth in paragraphs 62 and 70 of the third amended complaint.

Paragraph 70 alleges: "As a result of . . . December 21, 28 and 31, 1992, [private] meetings among Defendants Licari, Akin and Kroon [and the Bleier law firm], these Defendants made a collective commitment ('agreed to agree') to [enact Ordinance Nos. 1170 and 1171] at the January 4 and 5, 1993, meetings [actually, January 5 and 6 meetings]. [Ordinance Nos. 1170

---

[4]The term "meeting" for Brown Act purposes has been defined in a statute too recent to apply here. The term includes "any congregation of a majority of the members of a legislative body at the same time and place to hear, discuss, or deliberate upon any item that is within the subject matter jurisdiction of the legislative body or the local agency to which it pertains"; moreover, "any use of direct communication, personal intermediaries, or technological devices that is employed by a majority of the members of the legislative body to develop a collective concurrence as to action to be taken on an item by the members of the legislative body is prohibited." (§ 54952.2, subds. (a), (b).)

and 1171] . . . were [enacted] at meetings that were nothing more than a sham to bring to fruition the previous 'agreement to agree' of the three Supervisors."

There is a fatal legal flaw in this first prong. When incumbent supervisor Licari met with supervisors-elect Akin and Kroon in December 1992, the Brown Act did not apply to supervisors-elect, but only to those who had already assumed office. (See § 54952.1, added in 1993 and operative in 1994; 7 Witkin, Summary of Cal. Law (9th ed., 1996 supp.) Constitutional Law, § 580, p. 302.) Akin and Kroon did not assume office until noon on January 4, 1993. Thus, during the December 1992 meetings, there was no "legislative body" among defendants Akin, Kroon and Licari conducting public business in private. (See *Stockton Newspapers, Inc.* v. *Redevelopment Agency, supra,* 171 Cal.App.3d at p. 103.) The Legislature changed things in a statute first operative in 1994; that statute specifies: "Any person elected to serve as a member of a legislative body who has not yet assumed the duties of office shall conform his or her conduct to the requirements of [the Brown Act] and shall be treated for purposes of enforcement of [the Brown Act] as if he or she has already assumed office." (§ 54952.1; Stats. 1993, ch. 1137, § 1, operative Apr. 1, 1994, and a 1994 amend. operative Apr. 1, 1994.)

██ The general rule is that when the Legislature amends a statute, its purpose is to change existing law unless the Legislature clearly expresses to the contrary. (*Victoria Groves Five* v. *Chaffey Joint Union High Sch. Dist.* (1990) 225 Cal.App.3d 1548, 1554 [276 Cal.Rptr. 14].) ██ The Legislature did not clearly express to the contrary here. That section 54952.1 served as a change in existing law is also borne out by the legislative history of the section, of which we take judicial notice. (Sen. Local Gov. Com. on the Dec. 7, 1992, version of Sen. Bill No. 36, p. 2 (1993-1994 Reg. Sess.); Rep., Sen. Rules Com., Office of Sen. Floor Analyses, Sen. Bill No. 36, p. 3 (1993-1994 Reg. Sess.); Rep., Assem. Com. Local Gov., July 14, 1993, on Sen. Bill No. 36, p. 2 (1993-1994 Reg. Sess.).) (Evid. Code, §§ 452, subd. (c), 459.)[5]

Paragraph 62 states: "Plaintiffs are informed and believe and thereon allege that on or about January 5, 1993, [plaintiffs later emphasized the date,

---

[5]We decline defendants' request to take judicial notice of (i) the legislative history of section 65867.5 ("A development agreement is a legislative act which shall be approved by ordinance and is subject to referendum . . . ."), and (ii) the records in County of Sutter v. Sutter Bay Associates (Super. Ct. Sutter County, 1993, No. 53847) (a case similar to the present case; defendants argue that these records show that the June 1993 referendum invalidated plaintiff's development agreement; but all parties here agree that the *effect* of that referendum vote is not directly in issue in the present case).

We also decline plaintiff's request to take judicial notice of a letter from the Director of the Governor's Office of Planning and Research, expressing various opinions. (See motions for judicial notice accompanying draft and briefs.)

January 4], after Defendants AKIN and KROON had assumed their duties and office as supervisors, a series of meetings were conducted between Defendants LICARI, AKIN and KROON and the Bleier attorneys, during some of which all three supervisors were present and others in which all three supervisors were never present, but through which the three supervisors reached collective agreements on modifications to documents that constituted part of the "invalidation plan.' "

In their initial moving papers on summary adjudication, defendants did not address paragraph 62. Defendants thought that plaintiff had dropped the January 4 meetings from the serial meeting allegation (paragraph 70 of the second amended complaint included the January 4 meetings, but the parallel paragraph 70 of the third amended complaint did not).

In its papers opposing summary adjudication, plaintiff did not submit a section 437c, subdivision (b), separate statement of material facts regarding paragraph 62. However, plaintiff's attorney did submit a declaration summarizing pertinent deposition testimony on this point (and attached the deposition excerpts.)

█ In their reply papers, the defendants argued that if the third amended complaint included the January 4 meetings in the serial meeting allegation, "then *plaintiffs' own evidence* demonstrates that defendants are entitled to summary adjudication[.]" (Italics in original.) Procedurally, this was proper. (See *Juge* v. *County of Sacramento* (1993) 12 Cal.App.4th 59, 70 [15 Cal.Rptr.2d 598] [a trial court has the inherent power to grant summary judgment on a ground not explicitly tendered by the moving party when the parties' separate statements of material facts and supporting evidence demonstrate the absence of a triable issue of material fact, and the opposing party has had a chance to respond to the legal ground and show there is a triable issue of material fact]; see also *Rio Linda Unified School Dist.* v. *Superior Court, supra,* 52 Cal.App.4th at p. 735; *Union Bank* v. *Superior Court, supra,* 31 Cal.App.4th at p. 590, and *Hunter* v. *Pacific Mechanical Corp., supra,* 37 Cal.App.4th at pp. 1286-1287 [in establishing summary adjudication, a moving party may note that its opponent's discovery responses present no evidence to support one or more elements of the cause of action].)

█ As for the January 4 meetings, the plaintiff's attorney's summary of the relevant depositions shows the following.

An attorney from the Bleier Law Offices, James Calkins, who worked with Licari, Akin and Kroon regarding the development agreement issue, was present (presumably on January 4) when Licari and Akin signed the notice of special meeting (for January 5). Calkins also noted there were two meetings involving supervisors, one of which included Licari (presumably

on January 4, but the date was not identified). At a third meeting (again, no date provided) Akin apologized to Supervisor Bechtel (elected in November 1992 and took office on January 4 as well) "for not informing her of their plans at an earlier time." Calkins also noted other meetings, with various people being added and subtracted.

Brenton Bleier, the principal in the Bleier Law Offices, recalled a meeting with Licari and Bechtel (date not specified, but presumably after Bechtel was a supervisor) where Licari "explained to Bechtel what he was planning to do and why he had not confided his plan [to] her prior to that time."

Supervisor Bechtel said that around noon on January 4, 1993, she had two meetings, one with either Licari or Kroon, the other with Akin. An agenda (presumably for the special meeting) was presented. Kroon apologized for failing to tell Bechtel about "the plan of action for a special meeting to be held on January 5." "[T]ime was running out"; they had to act before rights under the development agreements vested. It became immediately apparent to Bechtel "after hearing what Mr. Bleier said, that they had lots of plans, and I had not been included, or—I never knew anything about them."

Supervisor Kroon testified that on January 4 at 12:27 p.m., he signed the notice calling for a special meeting on January 5. This notice conformed to the goals outlined at the Bleier law firm on December 31, 1992. To prevent the vesting of rights under the development agreements, said Kroon, the board would have to repeal those agreements. The Bleier firm had laid out the "plan of action," which is the agenda summary attached to the call of the special meeting. On January 4, Kroon talked to Akin and Bechtel about calling the special meeting; he also talked to Licari, but did not recall what they discussed. The special meeting concerned important subjects, as identified in the agenda summary. Several meetings, including with the lawyers, were necessary "so that everything was done properly, and that the special meeting was called properly." The supervisors were cognizant of the Brown Act, and this necessitated the several meetings.

Supervisor Akin testified that Attorney Calkins said during the December 31, 1992, meeting "that it looks as though we can repeal an ordinance by using an urgency ordinance because of the time, and then by filing a permanent ordinance at a later date." Calkins said on December 31 that it would be prudent to call a special meeting for January 5, to act on measures to repeal the development agreements. At the December 31 meeting, Calkins discussed the actions they would have to take on January 5, to repeal the development agreements; Calkins outlined eight or nine steps. On January 4, Akin exchanged pleasantries with Licari and Kroon, but there were no conversations regarding any action to be taken. Akin knew that Licari and Kroon had met with the Bleier attorneys on that date, but he did not know

what was discussed. Akin met with Bechtel and Attorney Bleier on January 4, and may have met with Kroon. During the meeting with Bechtel and Bleier, Bleier may have indicated to Bechtel that he had met with Akin, Kroon and Licari and discussed their desires to take action on the development agreements.

Supervisor Licari testified that on January 4, he had several meetings with supervisors but with only one supervisor at a time. He attempted to conform to the Brown Act. Licari attempted to apologize to Bechtel for not including her in their plans beforehand. To prevent the vesting of the development agreements, urgent action (within 24 hours) was required.

The agenda summary for the January 5 special meeting included as "Business To Be Transacted" the interim urgency zoning ordinance (Ordinance No. 1170) and accompanying resolutions, a resolution repealing the resolution approving the South Sutter GPA, a resolution submitting the issue of land development in south Sutter County to an advisory vote, and a resolution authorizing study of a general plan amendment to south Sutter County.

By using the plaintiff's summary of the evidence, we have construed the opposition papers liberally. (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].) Nevertheless, these papers—which the movants, defendants, have adopted—do not show a triable issue of material fact regarding the January 4 meetings and their alleged violation of the Brown Act. The January 4 meetings show only plans and actions to call a special meeting on January 5 to consider the items in that special meeting's agenda. The Brown Act is not violated in this way. Under section 54956, "[a] special meeting may be called at any time . . . by a majority of the members of the legislative body . . . ."

The evidence concerning the December 1992 meetings may include more substantive deliberations or actions, or at least acquisition of information. But at that time, Akin and Kroon, as simply supervisors-elect, were not covered by the Brown Act, so a collective action, commitment or deliberation under that act could not then take place. (See § 54952.1; see also *Stockton Newspapers, Inc.* v. *Redevelopment Agency, supra,* 171 Cal.App.3d at pp. 101-103.) It was for the Legislature, not the judiciary, to determine a basic legislative question such as whether supervisors-elect were covered under the Brown Act, in 1992; they were not. (See §§ 54952, 54952.6, 54953; see also § 54952.1, operative Apr. 1, 1994.) The evidence regarding the January 4 meetings—when Akin and Kroon were full-fledged supervisors—shows only a lawful plan and action (to call a special meeting for January 5) to consider items discussed in December when the Brown Act did not apply. The evidence does not show that the items discussed in December

were again substantively discussed in January. In other words, the evidence shows a lawful agreement on January 4, 1993, to conduct a special meeting to consider a plan lawful when made in December 1992.

Plaintiff argues that any distinction between the December 1992 and the January 4, 1993, meetings is irrelevant. Plaintiff contends that the January 4 meetings were links in a single chain of serial meetings begun in December 1992, and that the December 1992 meetings were part of an ongoing conspiracy to violate the Brown Act.

However, the distinction between the December 1992 and the January 4, 1993, meetings cannot be discounted, for the simple reason that the Brown Act did *not* apply to the December meetings. The distinction is therefore clean and certain. ■ Moreover, it is settled that a civil conspiracy does not per se give rise to a cause of action unless an actionable civil wrong has been committed. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 511 [28 Cal.Rptr.2d 475, 869 P.2d 454].) A party cannot be bootstrapped into liability by the plea of civil conspiracy. (*Id.* at p. 514.) ■ Because the Brown Act did not apply to the December 1992 meetings, and the evidence shows only lawful activity regarding the January 4 meetings, there is no chain or conspiracy from which to construct a Brown Act violation using the December meetings.[6]

We conclude the trial court properly granted summary adjudication of plaintiff's cause of action alleging a violation of the Brown Act, and properly entered summary judgment.

### Disposition

The judgment is affirmed.

Puglia, P. J., and Blease, J., concurred.

---

[6]Interestingly, the January 5, 1993, special meeting was attended by around 200 people, including the plaintiff's representatives who spoke at length; covered over 200 pages of printed transcript; and included about every point of view that could have been expressed, procedurally and substantively.