[No. G024456. Fourth Dist., Div. Three. June 17, 1999.]

BUILDING INDUSTRY LEGAL DEFENSE FOUNDATION, Petitioner,
v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
CITY OF SAN JUAN CAPISTRANO et al., Real Parties in Interest.

### COUNSEL

Nossaman, Guthner, Knox & Elliott, Robert I. McMurry, John P. Erskine and Rick E. Rayl for Petitioner.

No appearance for Respondent.

Woodruff, Spradlin & Smart, John R. Shaw and M. Lois Bobak for Real Parties in Interest.

### OPINION

**SILLS, P. J.**—Government Code section 65858 allows a city to adopt an interim ordinance that prohibits any *uses* which may be in conflict with a general plan the city is considering, studying, or intends to study within a reasonable time.[1] And it expressly provides that a city shall not adopt an interim ordinance unless it makes a finding that the *approval* of additional subdivisions, building permits, or other entitlements would result in a current and immediate threat to the public safety, health, or welfare.

The question raised by this appeal is whether, given the express language of Government Code section 65858, a city may adopt an interim ordinance that prohibits the *processing* of development applications, such as a tentative subdivision map. We hold, under the plain language of the statute, that the answer is no.

I

The facts are not substantially in dispute. San Juan Capistrano is a general law city. It adopted a general plan in 1974 and has amended it several times over the years. The city has also adopted a slow growth ordinance, generally limiting the number of permits for new dwelling units to 400 per year. Residential development in the city has thus proceeded slowly.

---

[1]The scope of Government Code section 65858 is actually broader. (See fn. 3, *post*.) It speaks in terms of the local legislative body, which includes more than cities, and extends to specific plans and zoning ordinances, not just general plans. For purposes of clarity only, and to reflect the facts of this case, we discuss the statute in terms of a city and a general plan.

In 1997, Concorde Development, a limited partnership, submitted an application to the city for a 356-unit residential subdivision in an area bordered by several residential neighborhoods. The project, known as Whispering Hills, was not well received. Although the city denies it, Concorde alleges the nearby residents put pressure on members of the city council either to find some way to deny it or face the political consequences in the then upcoming November 1998 General Election. On April 21, 1998, and allegedly in response to the public outcry, the city council directed the planning department to begin studying possible amendments to the land use element of the general plan. About the same time, the city put out a request for consultants to prepare an environmental impact report for the Whispering Hills project.

On June 16, 1998, the city adopted an interim ordinance pursuant to Government Code section 65858. The stated purpose of the ordinance was to suspend the *processing* of development applications on certain large vacant lots pending a comprehensive review and update of the general plan. The city justified this ordinance on the ground that the general plan was adopted in 1974 and "although individual Elements have been revised, amended, added and adopted since this initial adoption, a comprehensive review of the overall document has not been conducted," and during the past year "a number of issues have been raised regarding the adequacy" of certain elements. The land use element has "designations that may not be appropriate and/or compatible with the overall goals and policies of the General Plan which should be studied," the circulation element "shows a number of arterial road alignments that may not be either financially or physically capable of being implemented," and the public facilities element includes existing school facilities that are "presently either overcrowded or facing overcrowding within the immediate future from building permits currently authorized." In addition, the city found the general plan financial analysis done in 1974 was out of date since, with the approval of Proposition 13 in 1978, an audit of the general plan was necessary to determine if it "continued to be a viable and sustainable Plan that will generate sufficient operating revenues to fully fund local services."

The ordinance directed the planning department to "suspend formal processing of all development applications." It did not prohibit the planning department from conducting "informational or special studies on proposed project applications, including, but not limited to, the preparation of environmental impact reports." However, it provided that "no formal meetings or public hearings shall be conducted concerning such documents with respect to said adequacy of these studies nor with the processing of land use

entitlement for proposed projects during the life of this interim urgency ordinance."

Various projects were exempted from the ordinance's reach. Exemptions included all approved development, such as vesting tentative maps, tentative maps for which a mass grading permit had been issued, and residential projects for which there was an approved development agreement. Also exempted were residential subdivisions of 50 or fewer lots or units, senior citizen developments, all nonresidential projects of less than 10 net usable acres, any public institutional use such as churches, schools, utilities, and government facilities, and agricultural operations permitted by the underlying zoning. While the city denies it, Concorde argues the effect of the exemptions was to exclude every parcel within the city except a small handful that have no present development plans—and, of course, the Whispering Hills project.

The ordinance then recited there was a current and immediate threat to the public health, safety, and welfare. Tracking the language of Government Code section 65858, the city found that "the approval of additional subdivisions, use permits, site plans, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning ordinance, except as exempted [by the ordinance], would result in that threat to public health, safety, and welfare." When Concorde questioned how such a finding could be made when the stated purpose of the ordinance was stop the processing of its development, the city explained it was a waste of city money and staff time to process a development application when the extent of the changes to the general plan were unknown.

The interim ordinance was adopted for a period of 45 days. On July 21, 1998, the city extended it 10 months and 15 days. The city has indicated it does not intend to further extend the ordinance.

Unable to process the Whispering Hills project, Concorde filed a complaint for declaratory relief and petition for writ of mandate and prohibition in the superior court. Building Industry Legal Defense Foundation (BILD), billing itself as the litigation arm of the Building Industry Association of Southern California, was also named as a plaintiff. BILD asserts it is a regional organization with over 1,600 members who are engaged in approximately 70 percent of the real property development in Southern California.

The superior court denied the petition. Because an appeal would not be decided until after the interim ordinance had expired, BILD filed a petition

for a writ of mandate in this court.[2] The petition asks that a peremptory writ of mandate issue prohibiting enforcement of the interim ordinance insofar as it applies to the processing of development applications (including the preparation, circulation, and certification of environmental documents), and commanding the city to accept and process development applications in accordance with state law. We issued an order to show cause. The city filed a return and oral argument was heard.

## II

Whether a city may adopt an interim ordinance prohibiting the formal processing of a development application turns on the interpretation of Government Code section 65858. In interpreting a statute, we must first examine its words, giving them "their ordinary, everyday meaning . . . unless, of course, the statute itself specifically defines those words to give them a special meaning." (*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238 [8 Cal.Rptr.2d 298], citations omitted.) Where the meaning of the words is "without ambiguity, doubt, or uncertainty, then the language controls. . . ." (*Id.* at p. 1239, citations omitted; see also *Diamond Multimedia Systems, Inc.* v. *Superior Court* (1999) 19 Cal.4th 1036, 1046-1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].)

Government Code section 65858 is a fairly lengthy statute. Since the majority of its provisions are not germane to the legal issue on appeal, the full text of the statute is included in the margin.[3] The two subdivisions which are relevant here are subdivisions (a) and (c).

---

[2]BILD has standing to pursue the petition. (See *California Homeless & Housing Coalition* v. *Anderson* (1995) 31 Cal.App.4th 450, 457-458 [37 Cal.Rptr.2d 639] [petitioner is beneficially interested and has standing to bring suit where public right involved and object of writ is to have public duty enforced].)

[3]Section 65858 provides: "(a) Without following the procedures otherwise required prior to the adoption of a zoning ordinance, the legislative body, to protect the public safety, health, and welfare, may adopt as an urgency measure an interim ordinance prohibiting any uses which may be in conflict with a contemplated general plan, specific plan, or zoning proposal which the legislative body, planning commission or the planning department is considering or studying or intends to study within a reasonable time. That urgency measure shall require a four-fifths vote of the legislative body for adoption. The interim ordinance shall be of no further force and effect 45 days from its date of adoption. After notice pursuant to Section 65090 and public hearing, the legislative body may extend the interim ordinance for 10 months and 15 days and subsequently extend the interim ordinance for one year. Any extension shall also require a four-fifths vote for adoption. Not more than two extensions may be adopted. [¶] (b) Alternatively, an interim ordinance may be adopted by a four-fifths vote following notice pursuant to Section 65090 and public hearing, in which case it shall be of no further force and effect 45 days from its date of adoption. After notice pursuant to Section 65090 and public hearing, the legislative body may by a four-fifths vote extend the interim ordinance for 22 months and 15 days. [¶] (c) The legislative body shall not adopt or extend

Subdivision (a) of Government Code section 65858 begins by providing that a city may adopt an *interim ordinance without following the notice and hearing procedures generally required for the adoption of a zoning ordinance.*[4] It then provides that a city may adopt "an interim ordinance prohibiting any *uses* which may be in conflict" with a general plan the city is studying. (Italics added.) Although what constitutes a "use" is not defined anywhere within section 65858, the term has a generally well-accepted meaning in planning and land use law.

■ Pursuant to its police power, a general law city is permitted to "[r]egulate the use of buildings, structures, and land as between industry, business, residences, open space, including agriculture, recreation, enjoyment of scenic beauty, use of natural resources, and other purposes." (Gov. Code, § 65850, subd. (a).) This provision allows a city to classify, exclude, restrict, and limit what a land owner may do with his or her property, subject of course to certain constitutional constraints. (*Euclid* v. *Ambler* (1926) 272 U.S. 365, 394-395 [47 S.Ct. 114, 121, 71 L.Ed. 303, 56 A.L.R. 1016]; see also 8 McQuillin, Municipal Corporations (1991) Zoning, §§ 25.119-25.119.10, pp. 462-467; Cal. Zoning Practice (Cont.Ed.Bar 1969) Types of Zones, §§ 6.4-6.32, pp. 200-219.) In day-to-day terms, this means a city may determine where residential, commercial, industrial, and other uses may be located within the city.

The power to establish uses does not include the power to fix procedures for processing development applications. Zoning ordinances merely

---

any interim ordinance pursuant to this section unless the ordinance contains legislative findings that there is a current and immediate threat to the public health, safety, or welfare, and that the approval of additional subdivisions, use permits, variances, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning ordinance *would result in that threat to public health, safety, or welfare.* [¶] (d) Ten days prior to the expiration of an interim ordinance or any extension, the legislative body shall issue a written report describing the measures taken to alleviate the condition which led to the adoption of the ordinance. [¶] (e) When an interim ordinance has been adopted, every subsequent ordinance adopted pursuant to this section, covering the whole or a part of the same property, shall automatically terminate and be of no further force or effect upon the termination of the first interim ordinance or any extension of the ordinance as provided in this section. [¶] (f) Notwithstanding subdivision (e), upon *termination of a prior interim ordinance,* the legislative body may adopt another interim ordinance pursuant to this section provided that the new interim ordinance is adopted to protect the public safety, health, and welfare from an event, occurrence, or set of circumstances different from the event, occurrence, or set of circumstances that led to the adoption of the prior interim ordinance."

[4]Subdivision (b) allows a city to first give notice and provide a hearing before adopting an interim ordinance. The city followed that procedure here. But the substantive standards for adoption of an interim ordinance, even when notice and hearing are afforded, are contained in subdivision (a).

determine what uses are permitted where. Once a permitted use is identified by the applicable zoning ordinance the procedure for processing a development application is established by state laws other than zoning. For example, an application for a tentative subdivision map such as the one Concorde submitted is governed by the Subdivision Map Act. (See Gov. Code, § 66410 et seq.)

The Subdivision Map Act (Map Act) provides that, "Regulation and control of the design and improvement of subdivisions are vested" in the city. (Gov. Code, § 66411.) It goes on to provide that, "The procedures set forth in this chapter shall govern the *processing*, approval, conditional approval or disapproval and filing of tentative, final and parcel maps and the modification thereof." (Gov. Code, § 66451, italics added.) ▇ Given that the Map Act has established a comprehensive procedure for processing development applications, and nothing in it allows a city to prohibit the processing of a tentative subdivision map that is complete (see *Griffis* v. *County of Mono* (1985) 163 Cal.App.3d 414, 425 [209 Cal.Rptr. 519] [where Legislature has intended that city may modify Map Act procedures it has said so in "no uncertain terms"]), a city cannot use an interim ordinance as a backdoor method to modify the rules. (Cf. *Beck Development Co.* v. *Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1201 [52 Cal.Rptr.2d 518] [nothing in Government Code respecting local land use regulation excuses local government from following Map Act procedures when hazard waste issue suspected]; see also *Mang* v. *County of Santa Barbara* (1960) 182 Cal.App.2d 93, 99 [5 Cal.Rptr. 724] [purpose of an interim ordinance is to zone property].)[5]

Even if Government Code section 65858, subdivision (a) could be read as allowing a city to refuse to process a development application, subdivision (c) poses another hurdle. It provides that a city "shall not adopt" an interim ordinance unless it finds "there is a current and immediate threat to the public health, safety, or welfare, and that the *approval* of additional subdivisions, use permits, variances, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning

---

[5] The city's interim ordinance also runs into problems with at least two other statutes. The Permit Streamlining Act requires a city to act within a very limited time after receipt of the submitted materials or the application is deemed complete (see Gov. Code, § 65943, subd. (b); see also *Selinger* v. *City Council* (1989) 216 Cal.App.3d 259, 269 [264 Cal.Rptr. 499]), and the California Environmental Quality Act sets up specific time deadlines for the completion of the environmental review of a project (see Pub. Resources Code, § 21151.5). Given that the interim ordinance runs afoul of the Map Act, we need not discuss its relationship with these other statutes.

ordinance would result in that threat to public health, safety, or welfare." (Italics added.)

Limiting the reach of an interim ordinance to those situations where actual approval of an entitlement for use is imminent is consistent with the purpose of interim controls. Interim ordinances, often referred to as "stop-gap" or "incubation period" ordinances, prohibit a property owner from using his or her property for a specified use for a limited period of time. (*CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 314 [118 Cal.Rptr. 315].) They protect and promote the planning process by, among other things, prohibiting the introduction of potentially nonconforming land uses that could defeat a later adopted general plan or zoning ordinance. (*216 Sutter Bay Associates* v. *County of Sutter* (1997) 58 Cal.App.4th 860, 869 [68 Cal.Rptr.2d 492]; see also Freilich, *Interim Development Controls: Essential Tools for Implementing Flexible Planning and Zoning* (1971) 49 J. Urb. L. 65, 77.)

The use of interim zoning ordinances has a long history in California. The first case to address the validity of an urgency ordinance was *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]. There, the city issued a building permit for construction of a "four-family flat dwelling." But the city immediately adopted an urgency ordinance making it unlawful to erect multifamily buildings in the area where petitioner intended to build and revoked his building permit. In upholding the permit revocation, the Supreme Court explained that, "It is a matter of common knowledge that a zoning plan of the extent contemplated in the instant case cannot be made in a day. Therefore, we may take judicial notice of the fact that it will take much time to work out the details of such a plan and that obviously it would be destructive of the plan if, during the period of its incubation, parties seeking to evade the operation thereof should be permitted to enter upon a course of construction which might progress so far as to defeat in whole or in part the ultimate execution of the plan." (*Id.* at p. 496.)

Some years after *Miller* was decided, the Legislature enacted Government Code former section 65806. The precursor to section 65858, it set forth the conditions and restrictions under which a city could adopt a "temporary interim zoning ordinance." (See *Anderson* v. *City Council* (1964) 229 Cal.App.2d 79, 92 [40 Cal.Rptr. 41].) Other than several minor amendments, such as limiting the length of an interim ordinance (see *Bank of the Orient* v. *Town of Tiburon* (1990) 220 Cal.App.3d 992, 1001-1002 [269 Cal.Rptr. 690]), the statute has not changed significantly over the years. Although the Legislature could have tied adoption of an interim ordinance to the

submission or processing of a development application, it chose to set the bar higher, restricting its application to situations where an approval of an entitlement of use was imminent.

Cases which have upheld the validity of urgency zoning ordinances adopted pursuant to this statute have involved situations where local agencies were faced with immediate threats of development. (See, e.g., *216 Sutter Bay Associates* v. *County of Sutter, supra,* 58 Cal.App.4th at p. 871 [prevented development agreement from becoming effective]; *Conway* v. *City of Imperial Beach* (1997) 52 Cal.App.4th 78, 90 [60 Cal.Rptr.2d 402] [prevented building permit from being obtained]; *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508 [35 Cal.Rptr. 480] [tentative subdivision map rejected].) While the city asserts the processing of a development application poses a similar threat, it does not cite any case which so holds.[6] This is not surprising since it is readily apparent that issuance of a building permit, approval of a conditional use permit, or approval of a tentative subdivision map, are acts which give the landowner a right to proceed. And when development progresses to a certain point the developer obtains a vested right to complete the project. On the other hand, the processing of a development application, such as a tentative tract map, does not allow a developer to establish a potentially nonconforming use or obtain vested rights. A tentative subdivision map is by definition tentative. Formal submission of the application to the city's planning department merely starts the wheels rolling and allows the city, the developer, and public to begin the environmental review process. It does not guarantee the landowner any right

---

[6]While it is seldom wise to rely on a sister state's interpretation of its statutes in interpreting California law, our independent research uncovered a Virginia case that is virtually on all fours. In *Bd. of Sup'rs of Fairfax Cty.* v. *Horne* (1975) 216 Va. 113 [215 S.E.2d 453], an urgency ordinance imposed a moratorium on the acceptance, filing, and processing of preliminary subdivision plats and site plans. In invalidating the ordinance, the court noted that there is a significant distinction between local regulations governing zoning and those governing subdivisions, and the urgency ordinance "which, though designated and adopted as a zoning ordinance, is, at least as to the parts in issue, a subdivision ordinance." (*Id.* at p. 456.)

We also located a case from New York. There, a town resolution prohibiting the acceptance, processing and approval of residential subdivisions was invalidated by the trial court. The appeal was dismissed when the moratorium expired. (*Dune Associates* v. *Town Bd. of the Town of East Hampton* (1983) 91 A.D.2d 968 [457 N.Y.S.2d 340, 341].) But when the developer sought to compel approval of its subdivision, the court held the moratorium resolution was a "valid stop-gap or interim zoning measure. . . ." (*Dune Associates, Inc.* v. *Anderson* (1986) 119 A.D.2d 574 [500 N.Y.S.2d 741, 743], citation omitted.) However, unlike the Virginia case which engaged in a detailed and thoughtful explanation of its opinion, the New York court, in just a single conclusory sentence, stated its holding ipse dixit.

to an approval of the proposed project. As always, the city retains the power to deny it. (Gov. Code, § 66474.)

We conclude Government Code section 65858 is clear. It authorizes a city to prohibit any uses which may be in conflict with a general plan being studied so long as the city makes a finding the approval of additional subdivisions and other entitlements of use would result in a current and immediate threat to the public health, safety, or welfare. Nothing in that section permits a city to prohibit the formal processing of development applications, such as a tentative subdivision map. Accordingly, the city's ordinance is invalid.

The city makes several weak arguments in an effort to save the ordinance, but only two are worth noting. The city suggests our reading of Government Code section 65858 is too narrow, and that the power to prohibit any uses necessarily includes the power to prohibit the formal processing of development applications. But as a general law city, "it 'has only those powers expressly conferred upon it by the Legislature, together with such powers as are "necessarily incident to those expressly granted or essential to the declared object and purposes of the municipal corporation." The powers of such a city are strictly construed, so that "any fair, reasonable doubt concerning the exercise of a power is resolved against the corporation." [Citation.]' . . ." (*Martin* v. *Superior Court* (1991) 234 Cal.App.3d 1765, 1768 [286 Cal.Rptr. 513], citations omitted.) Nothing in section 65858 permits the city to prohibit the processing of development applications, and we cannot say, especially in light of the express provisions of Government Code section 66451, that such power is necessarily included within it.

The city also suggests this court previously recognized in *City of Stanton* v. *Cox* (1989) 207 Cal.App.3d 1557 [255 Cal.Rptr. 682] that a moratorium ordinance may preclude the processing of a development application. In that case we stated that an ordinance adopted pursuant to Government Code section 65858 may "be used to impose a freeze on a project for a limited period of time." (207 Cal.App.3d at p. 1561, fn. 2.) But the city's reliance on that one phrase, which merely explained when city ordinances became effective, is misplaced. Nothing in Stanton's interim ordinance, which sought to close a bookstore and adult entertainment business, purported to preclude the submission or formal processing of a development application.

Let a peremptory writ of mandate issue directing the superior court to vacate and set aside its order upholding the validity of the city's interim

ordinance, and to enter a new and different order declaring the ordinance invalid to the extent it applies to processing development applications. Petitioner shall be awarded its costs.

Rylaarsdam, J., and Wallin, J.,* concurred.

A petition for a rehearing was denied July 19, 1999, and the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied September 15, 1999.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.