Filed 4/25/19; Certified for Publication 5/16/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CALIFORNIA CHARTER SCHOOLS ASSOCIATION, | B284162 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS166035) |
| v. | |
| CITY OF HUNTINGTON PARK et al., | |
| Defendants and Respondents. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge. Reversed.

Sheppard Mullin Richter & Hampton, Arthur J. Friedman and Alexander L. Merritt for Plaintiff and Appellant.

Alvarez-Glasman & Colvin, Arnold M. Alvarez-Glasman, Noel Tapia, Christopher G. Cardinale and Tania Ochoa for Defendants and Respondents.

Cox, Castle & Nicholson, Andrew B. Sabey and Linda C. Klein for California Building Industry Association and Building Industry Legal Defense Foundation as Amici Curiae.

Pacific Legal Foundation, Damien M. Schiff, Joshua P. Thompson and Jeremy Talcott for Pacific Legal Foundation as Amicus Curiae.

———————————

The City of Huntington Park (Huntington Park) enacted and extended an urgency ordinance that imposed a temporary moratorium on charter schools while it considered amending its zoning code. The California Charter Schools Association (Association) petitioned for writ of mandate seeking an order directing Huntington Park to invalidate approval of the ordinance on the ground it violated, among other things, the Planning and Zoning Law. (Gov. Code,[1] § 65000 et seq.) The trial court entered judgment denying the petition and the Association appealed. We hold as a matter of law that the ordinance is invalid because the findings contained therein of "numerous inquiries and requests for the establishment and operation of charter schools" did not amount to a "current and immediate threat" as required by section 65858, subdivision (c) to enact an urgency ordinance.

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    Huntington Park

The facts are not in material dispute.  Huntington Park is a small, densely populated working-class general law city[2] in Los Angeles County.

In September of 2016, the Huntington Park City Council held a series of public hearings to consider whether to enact an urgency interim zoning ordinance, under the authority of section 65858, to impose a temporary moratorium on the establishment, construction, and development of new charter schools within its borders.

The mayor stated at a hearing that Huntington Park is 3.1 square miles in size and contains approximately 59,000 residents and 20 schools, of which six are charter schools.  Huntington Park has more schools than any community in the southeast part of the county.  There are more than twice the amount of educational facilities than that needed to serve Huntington Park's school-age population, and many of those attending the schools are not residents of Huntington Park.  The population density and high number of schools attracting students from outside Huntington Park contributes to traffic, parking, and noise problems in the neighborhoods.

---

[2] A general law city has " 'only those powers expressly conferred upon it by the Legislature, together with such powers as are "necessarily incident to those expressly granted or essential to the declared object and purposes of the municipal corporation."  The powers of such a city are strictly construed, so that "any fair, reasonable doubt concerning the exercise of a power is resolved against" it.' " (*Martin v. Superior Court* (1991) 234 Cal.App.3d 1765, 1768.)

The assistant city attorney described a public safety issue. One neighborhood has three schools within a block of each other, causing traffic congestion on the narrow streets during student drop-off and pick-up. The traffic problems and related disruption to the community were sufficiently significant that the police and representatives from the schools formed a traffic "task force" that meets monthly to develop solutions.

Meanwhile, the Huntington Park City Council and City Attorney identified a "huge, huge" need for a diversity of land uses, such as services, businesses, and other revenue sources, which must compete with schools for limited space.

The Huntington Park Community Development Department, which requested the urgency ordinance, reported that it had received "a proliferation of inquiries and requests for the establishment and operation of charter schools." The Huntington Park Municipal Code (HPMC) requires charter schools to obtain conditional use permits (CUP),[3] which could be either approved or disapproved at the discretion of Huntington Park. But the HPMC contained no development standards for charter schools. The proposed interim ordinance would give staff time to assess whether the HPMC was adequate to ensure that future charter schools, and expansion or relocation of existing charter schools, could be done in a manner that protected the public and satisfied the goals and objectives of Huntington Park's general plan. And if not, to

---

[3] A CUP "is the approval for a particular use subject to conditions intended to assure that the special use authorized by the permit does not create conflicts or otherwise affect public health and safety." (7 Miller & Starr, Cal. Real Estate (4th ed. 2018) § 21:10.)

4

consider amending the HPMC to ensure sufficient protection for the community.

Asked how many applications for charter school development were being filed, the city planner explained that it had received "at least five inquiries and . . . had several serious sit down discussions" with charter school representatives within the preceding year.

II.     Huntington Park City Council adopts an urgency ordinance

In September 2016, Huntington Park City Council adopted urgency ordinance 2016-949 under section 65858 imposing a 45-day moratorium on the "establishment and operation of charter schools" and the "approval or issuance of licenses, permits or other entitlements for the establishment, construction, and development of charter schools."  The ordinance contained Huntington Park's findings that a "current and immediate threat" to public health, safety, and welfare existed because of the following:  (A) Huntington Park had received "numerous inquiries and requests for the establishment and operation of charter schools" that may be incompatible with current land uses and the general plan; (B) the HPMC did not have development standards specifically for charter schools; (C) certain locations in Huntington Park had already experienced adverse impacts from charter schools; (D) "as applications for approval or issuance of . . . permits or other entitlements for the establishment . . . of charter schools [are] submitted to [Huntington Park], there is no determination whether the locations and regulation of such uses are consistent with the purpose and intent of the [HPMC], which may undermine public health, safety, and welfare"; (E) the current HPMC did not ensure compatibility with other land uses as the result of Huntington Park's changed characteristics; and (F) Huntington Park sought "[t]o ensure the [HPMC's] consisten[cy] with the goals . . . and

5

standards of the General Plan."  Huntington Park City Council also found that the ordinance was exempt from the provisions of the California Environmental Quality Act (CEQA).  (Pub. Resources Code, § 21000 et seq.)

In October 2016, Huntington Park City Council adopted ordinance 2016-950, extending the moratorium for an additional 10 months and 15 days.  The extension recited that Huntington Park had received "a proliferation of inquiries and requests," and found that Huntington Park had "received numerous inquiries and requests for the establishment and operation of charter schools within Huntington Park that may be incompatible with current land uses and the General Plan."

III.    Procedural history

The Association filed its petition for writ of mandate (Code Civ. Proc., § 1085)[4] challenging the ordinance in three causes of action: (1) violation of section 65858; (2) violation of CEQA; and (3) preemption by the Charter Schools Act (Ed. Code, § 47601 et seq.).  In its reply brief, the Association added as an argument that the ordinance discriminated against charter schools.

The trial court denied the Association's writ petition.  The Association filed its timely appeal.

---

[4] "A traditional writ of mandate under Code of Civil Procedure section 1085 is a method of compelling the performance of a legal, usually ministerial duty.  [Citation.]  Generally, a writ will lie when there is no plain, speedy, and adequate alternative remedy; the respondent has a duty to perform; and the petitioner has a clear and beneficial right to performance."  (*Walnut Valley Unified School Dist. v. Superior Court* (2011) 192 Cal.App.4th 234, 237, fn. 4.)

## DISCUSSION

### I. Mootness

Huntington Park contends that this appeal is moot because ordinance 2016-950 extending the moratorium already expired by its own terms while the appeal was in the briefing stage. However, we need not determine whether the appeal is moot because we nonetheless have discretion to consider it. Even if technically moot, an appeal may be decided when, as here, "the issue ordinarily arises in controversies that are so short lived as to evade normal appellate review." (*Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 766.)

### II. Current and immediate threat under section 65858, subdivision (c)

"The general purpose of section 65858 is to allow a local legislative body to adopt interim urgency zoning ordinances prohibiting land uses that may conflict with a contemplated general plan amendment or another land use measure proposal which the legislative body is studying or intends to study within a reasonable period of time." (*216 Sutter Bay Associates v. County of Sutter* (1997) 58 Cal.App.4th 860, 869 (*Sutter Bay*).)[5] Such ordinances are within a city's police power. (*CEEED v. California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 314–315.)

---

[5] Subdivision (a) of section 65858 states in part, "the legislative body of a county, city, including a charter city, or city and county, to protect the public safety, health, and welfare, may adopt as an urgency measure an interim ordinance prohibiting any uses that may be in conflict with a contemplated general plan, specific plan, or zoning proposal that the legislative body, planning commission or the planning department is considering or studying or intends to study within a reasonable time."

7

Subdivision (c) of section 65858, at issue here, reads in relevant part, "[t]he legislative body shall *not adopt or extend* any interim ordinance pursuant to this section *unless* the ordinance contains legislative findings that *there is a current and immediate threat* to the public health, safety, or welfare, and that the approval of additional subdivisions, use permits, variances, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning ordinance would result in *that threat* to public health, safety, or welfare." (Italics added.)

In the context of a saturation of schools with the associated traffic problems, and an outdated municipal code, the ordinance contained the findings variously that Huntington Park had received a "proliferation of inquiries," and "numerous inquiries and requests for the establishment" of charter schools. The city planner's testimony, which supplied the factual underpinning, was that the department had received "at least five inquiries and . . . had several serious sit down discussions" with charter school representatives within the preceding year.[6] No actual CUP applications or pending charter school permits were in the record.

The Association challenges this finding of current and immediate threat. Noting that no actual development applications were pending when Huntington Park enacted the ordinance, the Association contends no current and immediate threat of a new charter school application approval existed to justify the use of the

_____

[6] The Association alternatively contended that the record contained insufficient evidence of inquiries. We do not address this issue as we have related the factual basis for the finding, which is not in dispute, and accept as true the findings contained in the ordinance to address the legal question of whether that finding constitutes a current and immediate threat under the statute.

8

police power, with the result that Huntington Park exceeded its authority in adopting the ordinance.

"Where the ordinance recites facts that constitute the urgency *and those facts may reasonably be held to constitute an urgency*, the courts will neither interfere with nor determine the truth of those facts." (*Sutter Bay*, *supra*, 58 Cal.App.4th at p. 868, italics added, citing *Crown Motors v. City of Redding* (1991) 232 Cal.App.3d 173, 179 (*Crown Motors*).) However, whether the recited facts may be held to constitute an urgency is a legal question. Under Code of Civil Procedure section 1085, when the relevant facts are undisputed, and the issue is one of statutory interpretation, the question is one of law for which we employ our independent review. (*Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1253.)

The Association relies on *Building Industry Legal Defense Foundation v. Superior Court* (1999) 72 Cal.App.4th 1410 (*Building Industry*) to argue as it did below, that current and immediate threat means that the approval of an entitlement or use is imminent, and so mere inquiries, requests, and meetings about a use do not meet the definition. *Building Industry* is persuasive.

*Building Industry*'s interim ordinance under section 65858 "suspend[ed] the processing of development applications on certain . . . lots pending . . . review and update of the [city's] general plan." (*Building Industry*, *supra*, 72 Cal.App.4th at p. 1413, italics omitted.) The city adopted the ordinance after a developer submitted an application for a residential subdivision. (*Ibid*.) As justification for the ordinance, the city recited that its antiquated general plan needed review and that issues had arisen about the adequacy of various land use elements and overcrowding or

9

potential overcrowding of schools in the immediate future " '*from building permits currently authorized*.' " (*Ibid.*, italics added.)

*Building Industry* held that the interim ordinance violated two subdivisions of section 65858.  Subdivision (a) of section 65858 authorizes interim ordinances to prohibit "uses," but not to "fix procedures for processing development applications." (*Building Industry*, *supra*, 72 Cal.App.4th at p. 1416.)  More relevant here, *Building Industry* also held that processing a development application did not constitute a current and immediate threat under subdivision (c) of section 65858.  (*Id*. at pp. 1416–1418.)  *Building Industry* concluded that "[l]imiting the reach of an interim ordinance to those situations where *actual approval of an entitlement for use is imminent is consistent* with the purpose of interim controls." (*Id*. at p. 1418, italics added.)

The legislative history of section 65858, subdivision (c), supported *Building Industry*'s conclusion:  "Although the Legislature could have tied adoption of an interim ordinance to the submission or processing of a development application, it chose to set the bar higher, restricting its application to situations where an approval of an entitlement of use was imminent." (*Building Industry*, *supra*, 72 Cal.App.4th at pp. 1418–1419.)  Likewise, *Building Industry* found that case law upholding the validity of urgency zoning ordinances under section 65858 involved situations where local agencies were faced with *immediate threats of development.*  (*Building Industry*, at p. 1419, citing *Sutter Bay*, *supra*, 58 Cal.App.4th 860, *Conway v. City of Imperial Beach* (1997) 52 Cal.App.4th 78 & *Metro Realty v. County of El Dorado* (1963) 222 Cal.App.2d 508.)

Another case, *Crown Motors*, *supra*, 232 Cal.App.3d 173, also addressed whether the requisite threat existed.  *Crown Motors* held

10

that the approval of a pending application for a use permit constituted a current and imminent threat under section 65858, subdivision (c) because the permit would have been approved within 30 days but for the urgency ordinance. (*Id.* at pp. 179–180.) In other words, actual approval of a permit was imminent.

The holding in *Building Industry* makes sense. *Issuing* a building permit and *approving* a development application are acts that give the landowner the right to proceed with development. "Formal submission of the application to the city's planning department merely starts the wheels rolling . . . . As always, the city retains the power to deny it." (*Building Industry*, *supra*, 72 Cal.App.4th at pp. 1419–1420.) The landowner only gains a vested right to complete the project as development proceeds; the mere processing of a development application does not endow a vested right. (*Ibid.*)

Likewise, with CUPs, municipalities have discretion, when reviewing such applications, to deny permits or to impose conditions on such permits. (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1224.) Although a CUP runs with the land and "creates a property right which may not be revoked without constitutional rights of due process" (*Malibu Mountains Recreation, Inc. v. County of Los Angeles* (1998) 67 Cal.App.4th 359, 367–368), no right vests until a permit is granted, and the successful applicant has thereafter acted upon the grant to his or her detriment. (*Ibid.*; *BreakZone Billboards*, at p. 1224.) If processing a filed application as in *Building Industry* does not pose a current and immediate threat to the public health, safety, or welfare because no rights will vest imminently, then mere inquiries, requests, and meetings, preliminary to submitting a CUP application, cannot possibly present that threat.

11

Huntington Park argues no case establishes the bright line rule proffered by the Association. But, as analyzed, *Building Industry*, *supra*, 72 Cal.App.4th 1410 does. Huntington Park misunderstands *Building Industry* when it argues that the analysis of subdivision (c) of section 65858 is dictum. *Building Industry* presents two independent, statutory grounds for invalidating the ordinance there, subdivision (a) and, relevant to our case, subdivision (c). *Selinger v. City Council* (1989) 216 Cal.App.3d 259, also cited by Huntington Park, does not undermine the Association's argument. *Selinger* held that a section 65858 ordinance imposing a development moratorium did not toll the one-year time period in which the city must act on a *pending application* under the Permit Streamlining Act (§ 65920 et seq.). (*Id*. at p. 269.) The development application in *Selinger* should have already been approved by operation of law when the urgency ordinance was adopted, with the result that the required threat was present. (*Id*. at pp. 264–265.) More important, *Selinger* did not discuss what constituted an urgency under section 65858, subdivision (c). " ' " '[C]ases are not authority for propositions not considered.' " ' " (*Reid v. City of San Diego* (2018) 24 Cal.App.5th 343, 367.) For the same reason, *Martin v. Superior Court*, *supra*, 234 Cal.App.3d 1765, cited by Huntington Park, is irrelevant. The issue there was whether the municipality could extend its urgency ordinance for more than the statutorily authorized two years. (*Id*. at p. 1772.) Imminent threat was never at issue in that case. Finally, neither *Sutter Bay*, nor *Crown Motors*, supports Huntington Park's stance. In the former, the urgency ordinance prevented a development agreement from vesting. (*Sutter Bay*, *supra*, 58 Cal.App.4th at p. 871.) As explained, the latter held that the approval of a use permit was imminent, thus justifying the

12

ordinance's findings.  (*Crown Motors*, *supra*, 232 Cal.App.3d at pp. 179–180.)

For the foregoing reasons, we hold that ordinance 2016-950 is not valid under section 65858 because mere inquiries, requests, and meetings do not constitute a current and immediate threat within the meaning of subdivision (c) of that statute.

Our conclusion renders it unnecessary for us to decide whether the ordinance was exempt from CEQA, was preempted by the Charter Schools Act, or discriminated against charter schools. We therefore do not address the Association's remaining contentions on appeal.

## DISPOSITION

The judgment is reversed.  California Charter Schools Association is awarded its costs on appeal.


DHANIDINA, J.


We concur:


EDMON, P. J.


EGERTON, J.

13

Filed 5/16/19

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| CALIFORNIA CHARTER SCHOOLS ASSOCIATION, | B284162 (Los Angeles County Super. Ct. No. BS166035) |
| Plaintiff and Appellant, | |
| v. | CERTIFICATION AND ORDER FOR PUBLICATION |
| CITY OF HUNTINGTON PARK et al., | |
| Defendants and Respondents. | |


The opinion in the above-entitled matter filed April 25, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


DHANIDINA, J.                    EGERTON, Acting P. J.