[No. B223891. Second Dist., Div. Three. Jan. 27, 2011.]

WALNUT VALLEY UNIFIED SCHOOL DISTRICT et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; ROWLAND UNIFIED SCHOOL DISTRICT et al., Real Parties in Interest.

Counsel

Parker & Covert, Spencer E. Covert and Jonathan J. Mott for Petitioners.

Pacific Legal Foundation and Sharon L. Browne for Parents for Choice and Senator Bob Huff as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Dannis Woliver Kelley, Sue Ann Salmon Evans, Jonathan A. Pearl and Sarah L. W. Sutherland for Real Parties in Interest.

Los Angeles County Office of Education, Vibiana M. Andrade and Sung Yon Lee for Los Angeles County Superintendent Darline P. Robles as Amicus Curiae on behalf of Real Parties in Interest.

## Opinion

**KLEIN, P. J.**—Defendants and petitioners Walnut Valley Unified School District and the Board of Education of the Walnut Valley Unified School District (collectively, Walnut), seek a writ of mandate directing respondent superior court to vacate its order granting a petition for peremptory writ of mandate and/or prohibition (Code Civ. Proc., §§ 1085, 1102) brought by plaintiff and real party in interest Rowland Unified School District (Rowland) and to enter a new order denying Rowland's petition.

The trial court's ruling precluded Walnut from enrolling for the 2010–2011 school year any students residing within Rowland's boundaries pursuant to the "District of Choice" program. (Ed. Code, § 48300 et seq.)[1]

---

[1] All further statutory references are to the Education Code, unless otherwise specified.

This is a dispute between two school districts which are competing for students and for the funding those students would bring to the district in which they are enrolled. The District of Choice program (added by Stats. 1993, ch. 160, p. 1445; former § 48209 et seq.), authorizes a school district to declare itself a " '[s]chool district of choice' " which accepts incoming students who seek to transfer from a " '[s]chool district of residence.' " (§ 48300.)[2]

Walnut, which has declared itself a District of Choice, sought to process 590 applications from students who reside in Rowland for the upcoming school year. Rowland objected to the departure of any more of its students, contending it has already met the 10 percent statutory cap on the number of outbound transfers. (§ 48307, subd. (b).)[3] Rowland also objected to the transfers on fiscal grounds. (§ 48307, subd. (d).)

We are called upon to construe section 48307, subdivision (b), which enables a school district of residence to limit the number of students transferring out of the district. Thereafter, we address the sufficiency of the evidence to support the trial court's determination the statutory cap has been met in this case.

We conclude the trial court's legal interpretation of the 10 percent statutory cap is correct. (§ 48307, subd. (b).) Further, substantial evidence supports the trial court's factual determination the 10 percent cap on outbound transfers from Rowland had been reached. Therefore, we deny Walnut's petition.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Rowland's petition in the court below.*

On February 1, 2010, Rowland filed a petition for a peremptory writ of mandate or prohibition,[4] seeking to enjoin Walnut from enrolling any students

---

[2] Section 48300 states: "For purposes of this article, the following definitions apply: [¶] (a) 'School district of choice' means a school district for which a resolution is in effect as described in subdivision (a) of Section 48301. [¶] (b) 'School district of residence' means the school district that a pupil would be directed by this chapter to attend, except as otherwise provided by this article."

[3] Section 48307 states in pertinent part at subdivision (b): "A school district of residence with an average daily attendance of less than 50,000 may limit the number of pupils transferring out to 3 percent of its current year estimated average daily attendance *and may limit the maximum number of pupils transferring out for the duration of the program authorized by this article to 10 percent of the average daily attendance for that period.*" (Italics added.)

[4] "A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty

who reside within Rowland's boundaries for the 2010–2011 school year. Rowland's petition invoked two statutory grounds for limiting outgoing District of Choice transfers.

First, Rowland contended as a school district with an average daily attendance of less than 50,000, it was entitled to limit the total number of pupils transferring out for the duration of the District of Choice program to 10 percent of the average daily attendance for that period. Rowland's average daily attendance for the years 1995 through 2009 was 17,527.60, so that it could limit the maximum number of students transferring out to 1,752.76. Because 2,054 students who resided in Rowland already had transferred out to surrounding school districts of choice, Rowland was entitled to preclude any further outbound transfers under the program. (§ 48307, subd. (b).)

In addition, Rowland contended it was entitled to limit further outbound transfers because the Los Angeles County Superintendent of Schools (Superintendent) had determined Rowland would not meet the standards and criteria for fiscal stability for the subsequent fiscal year exclusively due to the impact of additional outbound District of Choice transfers. (§ 48307, subd. (d).)

### 2. *Walnut's opposition below.*

Walnut disagreed with Rowland's interpretation of the 10 percent cap specified in section 48307, subdivision (b). Walnut argued the 10 percent cap had not been reached because 10 percent of Rowland's average daily attendance was not *currently* enrolled in Walnut.

According to Walnut's calculations, there were currently 742 District of Choice students enrolled in Walnut who originated from Rowland. Rowland's current year average daily attendance was 16,029 and 10 percent thereof is 1,602. Because only 742 Rowland students were currently enrolled in Walnut, Walnut was entitled to enroll an additional 860 students from Rowland. Therefore, Walnut should be able to proceed with the 590 Rowland applications which were pending before it.

---

resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by that inferior tribunal, corporation, board, or person." (Code Civ. Proc., § 1085, subd. (a).) A traditional writ of mandate under Code of Civil Procedure section 1085 is a method of compelling the performance of a legal, usually ministerial duty. (*Pomona Police Officers' Assn. v. City of Pomona* (1997) 58 Cal.App.4th 578, 583–584 [68 Cal.Rptr.2d 205].) Generally, a writ will lie when there is no plain, speedy, and adequate alternative remedy; the respondent has a duty to perform; and the petitioner has a clear and beneficial right to performance. (*Id.* at p. 584.)

Walnut also disputed the fiscal instability argument, contending the standards for limiting outbound student transfers from Rowland on fiscal grounds had not been met.

### 3. *Trial court's grant of Rowland's petition.*

On April 15, 2010, the matter came on for hearing. Prior to the hearing, the trial court issued a 10-page tentative ruling. At the conclusion of the hearing on Rowland's petition, the trial court adopted its tentative ruling as the order of the court. The trial court found in favor of Rowland on both grounds, i.e., the 10 percent aggregate cap had been met, and any further transfers of students would impair Rowland's fiscal stability.

### a. *Trial court's interpretation of the 10 percent statutory cap.*

The trial court ruled in pertinent part: "Under the plain meaning of section 48307, there are two circumstances in which a district of residence can limit the number of pupils transferring to a [District of Choice]: (1) a district with less than 50,000 in average daily attendance [(i.e., Rowland)] may limit the number of transfers to 3% of the district's current year average daily attendance; and (2) such a district may limit to a number which is 10% of the average daily attendance those pupils who transfer during the entire duration of the district of choice program.

"Walnut argues that the language 'for that period' in the phrase '[the district] may limit the maximum number of pupils transferring out for the duration of the program authorized by this article to 10% of the average daily attendance for that period' refers back to 'the current year.' Under Walnut's statutory construction, a qualifying district (1) may limit the number of transfers to 3% of the district's current year average daily attendance, and (2) may limit the number of transfers during the district of choice program to a total of 10%, calculated based on the *current year's* average daily attendance. Walnut contends that Rowland's interpretation would permit Rowland to count any student who ever transferred from Rowland under the program, whether the student is actively enrolled in another district, has graduated, moved, or enrolled in a private school.

*"The plain meaning of section 48307(b) is just as Rowland states. The 10% cap on transfers out of the district of choice means 10% of the average daily attendance for the period of the district of choice program. . . .*

"This plain language interpretation also is consistent with rules of construction that a qualifying phrase applies to the word, phrase or clause immediately preceding it unless context or evident meaning require a different

construction. [Citation.] The phrase 'that period' appears closest to, and refers back to, 'duration of the program.'

"*An interpretation in which 'that period' refers to duration of the program* is consistent with the fact that section 48307(b) sets forth two bases on which a district of residence may limit transfers under the program—one in which the transfers are limited to 3% of the current year estimated daily average attendance and a second in which the maximum number of transfers is 10% of the daily average attendance for a period. The words 'current year' occur with respect to the first basis, while both the phrase 'that period' and the phrase 'the duration of the program' occur in the second ground for limitation.

"The actual numbers involved in section 48307(b)—3% as an annual limit and 10% as a top limit—are consistent with Rowland's interpretation. Walnut's interpretation would mean that there would have to be 10% of Rowland's former students actively enrolled in the district of choice program on the date in question. In order to reach that cap, Rowland probably also would have already reached the 3% cap for any one year. As a practical matter, the 10% cap then would be partly redundant. *It is far more likely that section [4]8307(b)'s 10% cap was intended to be an absolute cap on the loss of a residence district's students.*

"Walnut relies on a November 3, 2009 letter by Senators Romero and Huff, the joint authors of Senate Bill 680 creating the budget limitation exception to the district of choice program. This letter states that the 10% cap is calculated *based on the current year average daily attendance in the district of residence* (Rowland) and the total number of transfers currently enrolled in the district of choice (Walnut). These numbers may fluctuate depending on the average daily attendance in the district of residence, and the active number of transfers, in the current year.

"The court cannot resort to legislative history unless the statute is ambiguous. The court does not find an ambiguity in section [48307, subdivision (b)]. Even if *arguendo* the statute is ambiguous, the SB 680 letter is not an extrinsic aid to interpretation because it does not state the Legislature's intent, but rather was sent after the amendment was enacted and is a *post hoc* interpretation by a bill's authors. See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30 [34 Cal.Rptr.3d 520]. The letter is further not useful because the district of choice program was enacted in 1994 . . . . The language in section 48307(b) is identical to former section 48209.7(b), which was enacted in 1994. Neither Senator Romero nor Senator Huff authored section 48209.7(b).

"Moreover, the authors of SB 680 may have intended the statute to operate in the manner they state, but the statute clearly does not support their intention . . . . In any event, resort to legislative history is unnecessary where a statute has a plain meaning as section 48307 does. [¶] . . . [¶] In sum, section [48307, subdivision (b)] permits Rowland to cap at 10% the number of students who have transferred from the district over the life of the district of choice program." (Some italics added.)

> b. *Trial court's factual determination the 10 percent threshold had been reached so as to entitle Rowland to refuse any further outbound transfers.*

The trial court ruled: "It is undisputed that Rowland has had an average daily attendance of less than 50,000 since the district of choice legislation went into effect in 1994. That average daily attendance is 17,527.60. Thus, if 10% of that figure, or 1,752.76, have transferred from Rowland to other districts under the district of choice program, Rowland may impose the section 4[8]307(b) cap.

"Rowland presents evidence from an independent third party consultant that 1,940 Rowland students have transferred to Walnut and 114 students transferred to Hacienda La Puente during the district of choice program, a total of 2,054.

"Walnut contends that the independent consultant considered applications to transfer, not actual transfers. Walnut contends that only 1,411 students actually transferred to it from Rowland under the district of choice program. A number of applicants accepted to Walnut from Rowland either chose to remain in Rowland, enrolled in private schools, or moved to other districts and never enrolled in Walnut. Adding the 144 Hacienda La Puente students would mean that 1,555 students have transferred from Rowland under the district of choice program.

*"There are serious problems with Walnut's evidence.* First, although it contends that the evidence is based on district of choice transfer and enrollment records, it had no duty to maintain enrollment records. Indeed, Walnut admitted to the consultant that it had destroyed the district of choice records from 2002–2003, and did not have complete data for 1995 through 2003. Walnut's 'AERIES student information system enrollment records' used to prepare the spreadsheet attached to the Declaration of Jan Keating are therefore suspect. Second, Walnut agreed to the appointment of the independent consultant to perform the accuracy of the number of students who had transferred from Walnut. The consultant's report is not limited to applications. It states that the report summarizes his review of the 'number of Rowland . . .

students who have enrolled as DISTRICT OF CHOICE in Walnut . . . .'
While the report does refer to 'applications' presented by the two districts, it also states that he reviewed 'folders' and 'records of data.' More important, the report states that '[t]he only data that was reviewed were those students that participated in the District of Choice program . . . .' The court cannot conclude that the consultant *only* reviewed applications. Third, since the consultant's report, Walnut has consistently signed off on the fact that the 10% cap had been reached and refused to enroll district of choice students from Rowland.

"Thus, it may be that the consultant reviewed only applications and not actual transfers. But it is far too late for Walnut to assert that position now. More than 10% of Rowland's students have transferred under the district of choice program, and it is entitled to cap that amount until such time as 2,054 students no longer represents more than 10 percent of Rowland's average daily attendance over the duration of the [District of Choice] authorization. Thus, Rowland may prohibit [District of Choice] transfers; it is entitled to writ relief."

### c. *Fiscal instability.*

With respect to the fiscal instability issue, the trial court noted that in view of its finding the 10 percent statutory cap had been reached, it was unnecessary to determine whether Rowland also could prohibit the transfers pursuant to section 48307, subdivision (d), the fiscal stability provision. Nonetheless, the trial court proceeded to address the fiscal issue.

The trial court concluded, "it is clear that the County Superintendent has determined that Rowland will not meet the standards for fiscal stability in 2010–11, not because it won't have sufficient reserves in that year, but because it will not have sufficient reserves two years out. It is also clear that this failure is solely attributable to the projected transfers to Walnut under the district of choice program. Without the transfers, Rowland would have a positive certification even though it has natural declining enrollment and State budget cuts will hit all schools."

In sum, Rowland prevailed below on both grounds. The trial court found the 10 percent statutory cap on outbound transfers had been reached, and that additional transfers of students would impair Rowland's fiscal stability.

### 4. *Walnut seeks writ relief.*

On April 22, 2010, without waiting for entry of judgment, Walnut filed the instant petition for writ of mandate and requested an immediate stay of the

trial court's April 15, 2010 order, to enable Walnut to process 590 pending District of Choice applications from Rowland students for the 2010–2011 school year beginning August 23, 2010.

On May 13, 2010, this court denied Walnut's request for an immediate stay. However, because Walnut's petition raised a significant issue with respect to the interpretation of section 48307, we issued an order to show cause and invited amicus curiae briefing.[5]

## CONTENTIONS

Walnut contends it is entitled to a writ of mandate to enable it to admit additional students from Rowland because (1) Rowland failed to establish the 10 percent cap on outbound transfers had been met (§ 48307, subd. (b)); and (2) Rowland failed to establish the outbound transfers would undermine Rowland's fiscal stability (§ 48307, subd. (d)).

## DISCUSSION

1. *Standard of review.*

In reviewing the trial court's decision " 'on a petition for writ of ordinary mandate, the appellate court applies the substantial evidence test to the trial court's factual findings, but exercises its independent judgment on legal issues, such as the interpretation of statutes. [Citation.]' " (*Committee for Responsible School Expansion v. Hermosa Beach City School Dist.* (2006) 142 Cal.App.4th 1178, 1184 [48 Cal.Rptr.3d 705].)

2. *Overview of District of Choice program.*

Historically, each person subject to compulsory full-time education was required "to attend the school in which the residency of either the parent or legal guardian is located, subject to specified exceptions." (Legis. Counsel's Dig., Assem. Bill No. 19 (1993–1994 Reg. Sess.) 5 Stats. 1993, ch. 160, Summary Dig., p. 67.)

Assembly Bill No. 19 (1993–1994 Reg. Sess.), approved by the Governor on July 20, 1993, was codified in former section 48209 et seq. (Stats. 1993, ch. 160, § 1, p. 1445.) This legislation authorized the governing board of any school district "to admit pupils residing in another school district to attend any school in that district, as specified. The bill . . . require[d] each school district that elects to accept transfers to adopt a resolution to determine the

---

[5] Amicus curiae briefs were filed on behalf of Walnut and Rowland.

number of transfers it will accept and to ensure that the pupils admitted under the policy are selected through a random, unbiased selection process. [¶] . . . The bill . . . authorize[d] districts of residence to limit the number of pupils newly transferring out each year as specified." (Legis. Counsel's Dig., Assem. Bill No. 19 (1993–1994 Reg. Sess.) 5 Stats. 1993, Summary Dig., p. 67.)

In 2004, the District of Choice legislation was recodified in section 48300 et seq. (Stats. 2004, ch. 21, § 1, p. 86.) The District of Choice legislation remains at section 48300 et seq. in an article captioned "Pupil Attendance Alternatives."

Section 48301, subdivision (a), reiterates that "pupils admitted under the [District of Choice] policy are selected through a random, unbiased process . . . ." School districts "are encouraged to hold informational hearings on the current educational program the district is offering so that parents may provide input to the district on methods to improve the current program and so that parents may make informed decisions regarding their children's education." (§ 48302.) Further, it is "the intent of the Legislature that every parent in this state be informed of their opportunity for currently existing choice options under this article regardless of ethnicity, primary language, or literacy." (§ 48314.)

The District of Choice program contains a sunset provision, making it finite in its duration. Section 48315 as originally enacted in 2004, stated: "This article shall become inoperative on July 1, 2007, and, as of January 1, 2008, is repealed, unless a later enacted statute, which becomes effective on or before January 1, 2008, deletes or extends the dates on which it becomes inoperative and is repealed." (Added by Stats. 2004, ch. 21, § 1, p. 86.)

In 2007, the inoperative and repeal dates in section 48315 for the provisions governing interdistrict transfers were extended to July 1, 2009, and January 1, 2010, respectively. (Stats. 2007, ch. 174, § 5.)

In 2009, the inoperative and repeal dates in section 48315 again were extended, this time to July 1, 2016, and January 1, 2017, respectively. (Stats. 2009, ch. 198, § 8.)

The crucial provision for our purposes is the interpretation of section 48307, subdivision (b), which authorizes a district of residence to limit the number of outbound transfers. We now turn to that issue.

3. *Trial court properly held the 10 percent statutory cap on outbound transfers is based on the average daily attendance for the duration of the District of Choice program.*

    a. *Principles of statutory interpretation.*

■ In approaching the issue, we "apply the well-established rules of statutory construction and seek to ' "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] As always, we begin with the words of a statute and give these words their ordinary meaning. [Citation.] If the statutory language is clear and unambiguous, then we need go no further. [Citation.] If, however, the language is susceptible to more than one reasonable interpretation, then we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324] (*Hoechst*).)

    b. *Ten percent cap is based on the average daily attendance in the district of residence for the duration of the District of Choice program.*

Section 48307, subdivision (b), states: "A school district of residence with an average daily attendance of less than 50,000 may limit the number of pupils transferring out to 3 percent of its current year estimated average daily attendance *and may limit the maximum number of pupils transferring out for the duration of the program authorized by this article to 10 percent of the average daily attendance for that period.*" (Italics added.)[6]

■ Thus, there are two caps in section 48307, subdivision (b). A school district of residence may limit the number of outbound transfers "to 3 percent of its current year estimated average daily attendance . . . ." (*Ibid.*) In addition, a school district of residence "may limit the maximum number of pupils transferring out *for the duration of the program* authorized by this article to 10 percent of the average daily attendance for that period." (*Ibid.*, italics added.)

With respect to the 10 percent cap, Walnut's petition to this court contends: "The proper interpretation of the 10 percent cap is to examine the total number of Rowland District of Choice transfers currently enrolled in Walnut

---

[6] It is undisputed that Rowland's average daily attendance is far below 50,000 students. Therefore, section 48307, subdivision (b) is applicable.

Valley (742) and elsewhere (114), *divided by Rowland's current year [average daily attendance]* (15,420), which would equal only 5.55 percent." (Italics added.)[7]

Walnut's argument flies in the face of the plain language of the statute. The plain language interpretation is that the 10 percent cap is based on Rowland's average daily attendance *for the duration* of the District of Choice program. (§ 48307, subd. (b).)

■ This plain language interpretation also is consistent with rules of construction that "a qualifying phrase applies to the word, phrase or clause immediately preceding it, unless context or evident meaning require a different construction. [Citations.]" (*People v. Cruz* (1974) 12 Cal.3d 562, 566 [116 Cal.Rptr. 242, 526 P.2d 250].) The final two words in section 48307, subdivision (b), namely "that period," appear closest to and refer back to the phrase "the duration of the program."

As the trial court found, Walnut's reliance on a November 3, 2009 letter authored by Senator Gloria Romero and Senator Bob Huff with respect to the interpretation of the 10 percent cap is unavailing. The legislators' letter, which was printed in the November 4, 2009 Senate Journal, asserted the 10 percent value is based on "the total number of resident district student transfers *currently enrolled* in a school district of choice." (Italics added.) However, as the trial court found, section 48307, subdivision (b), is not ambiguous in this regard. Therefore, Walnut's resort to this extrinsic material is inappropriate. (*Hoechst, supra,* 25 Cal.4th at p. 519.) Moreover, the legislators' letter cannot vest section 48307, subdivision (b), with a meaning it clearly lacks.

Further, as the trial court observed, if the 10 percent cap were based on the current year average daily attendance, the 3 percent cap based on the current year average daily attendance would be superfluous. (*Woosley v. State of California* (1992) 3 Cal.4th 758, 776 [13 Cal.Rptr.2d 30, 838 P.2d 758] [interpretations that render statutory terms surplusage are to be avoided].)

We recognize our interpretation the 10 percent cap is based on the number of outbound transfers "for the duration of the program" (§ 48307, subd. (b)) makes it likely that eventually a district of residence will attain the 10 percent cap, so as to enable it to prohibit any further outbound transfers.[8] However,

---

[7] We note that in the instant petition for writ of mandate, Walnut offers a somewhat different calculation of the 10 percent cap than it asserted below in its opposition filed April 2, 2010.

[8] If our interpretation of section 48307, subdivision (b), is not what the Legislature intended, the statute could use clarification. (See *International Longshoremen's & Warehousemen's Union v. Los Angeles Export Terminal, Inc.* (1999) 69 Cal.App.4th 287, 304, fn. 6 [81

the inclusion in the statutory scheme of a sunset provision (§ 48315) reflects the District of Choice legislation was enacted as a pilot program. If the Legislature determines this legislation should be extended further or made permanent, it presumably will address whether to alter the cap on outbound transfers. In fact, as discussed below, the Legislature already has considered whether to eliminate the 10 percent cap and has declined to do so.

c. <em>Legislative history confirms our interpretation of the statute.</em>

Assuming arguendo section 48307, subdivision (b), pertaining to the 10 percent cap, is ambiguous, so as to warrant delving into the legislative history, the legislative record is consistent with our interpretation of the statute.

The District of Choice program was most recently reauthorized by Senate Bill 680 (2009–2010 Reg. Sess.) (Senate Bill 680), signed into law on October 11, 2009. As amended on May 28, 2009, Senate Bill 680 would have modified section 48307, subdivision (b), as follows: "A school district of residence with an average daily attendance of less than 50,000 may limit the number of pupils transferring out to 3 percent of its current year estimated average daily attendance and may limit the maximum number of pupils transferring out for the duration of the program authorized by *of the district pursuant to* this article to 10 percent of the average daily attendance for that period." (Sen. Bill 680 (2009–2010 Reg. Sess.) as amended May 28, 2009, pp. 3–4.) Thus, the May 28, 2009 version would have eliminated the 10 percent durational cap on outbound transfers.

The bill analysis of the May 28, 2009 version of Senate Bill 680 stated, inter alia: "4) Repeals the authorization for districts to cap the maximum number of students transferring out at 10% based on average daily attendance (ADA) for the duration of the program." (Assem. Com. on Education, Analysis of Senate Bill 680, as amended May 28, 2009, p. 1.)

The bill analysis of the May 28, 2009 version of Senate Bill 680 further stated: "Repealing the 10% Maximum Cap. The bill repeals the authorization for districts with less than 50,000 ADA to cap the maximum number of students transferring out at 10% for the duration of the program. *Without a maximum cap for the duration of the program, districts will be unable to cap the total number of students transferring out of their district over time. Instead, districts would only be authorized to cap the annual number of students transferring out at 3%, but there would no longer be a maximum cap over time. The committee should consider the negative impacts on districts this change will bring to districts that have already reached the 10%*

Cal.Rptr.2d 456]; *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1256, fn. 10 [15 Cal.Rptr.3d 344].)

*maximum cap, and who would be forced to allow more students to transfer out of their district in the future.*" (Assem. Com. on Education, Analysis of Senate Bill 680, as amended May 28, 2009, p. 5, italics added.)

After considering the adverse impact of deleting the 10 percent durational cap on districts that had already attained the 10 percent cap on outbound transfers, the Legislature restored the 10 percent cap to Senate Bill 680, and the bill passed with the 10 percent cap intact. (Stats. 2009, ch. 198, § 4; § 48307, subd. (b).)

Thus, the Legislature is well aware of the 10 percent durational cap on outbound transfers and it has elected to leave the cap in place, in order to protect districts which already have lost 10 percent of their average daily attendance pursuant to the District of Choice program.

### d.   *Opinion of Legislative Counsel is consistent therewith.*

We also note the interpretation of the Legislative Counsel is in accord.[9] On October 23, 2009, following the enactment of Senate Bill 680, in response to a request by Assemblyman Hernandez, the Legislative Counsel Bureau issued a written confirmation letter "regarding the effect of the enactment of Senate Bill No. 680 of the 2009–2010 Regular Session." The Legislative Counsel opined, "a school district of residence that, as of June 30, 2009, has reached the 10-percent limit pursuant to subdivision (b) of Section 48307 of the Education Code on the maximum number of students that it permits to attend a district of choice, *is not required,* based on the enactment of S.B. 680, *to allow additional pupils to attend a school district of choice* as of January 1, 2010." (Italics added.) The opinion letter noted that the Legislature had specifically considered whether to delete the 10 percent durational cap, and that "S.B. 680 was subsequently amended on June 24, 2009, to restore the 10-percent cap. This legislative history supports the view that the Legislature intended, in enacting Senate Bill 680, to extend the existing program without altering the operation or effect of the existing 10-percent cap."

### e.   *No merit to Walnut's argument the durational cap should be calculated as of 2004, rather than 1994.*

For the first time at oral argument before this court, Walnut contended the duration of the instant District of Choice program commenced not in 1994, but rather in 2004, at which time the earlier District of Choice legislation

---

[9] The opinion of the Legislative Counsel, although not binding on the court, is entitled to consideration. (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2]; *Los Angeles County Dependency Attorneys, Inc. v. Department of General Services* (2008) 161 Cal.App.4th 230, 240 [73 Cal.Rptr.3d 817].)

(Assem. Bill No. 19 (1993–1994 Reg. Sess.); former § 48209 et seq.; Stats. 1993, ch. 160, § 1, p. 1445), was recodified. (Assem. Bill No. 97 (2003–2004 Reg. Sess.); § 48300 et seq.; Stats. 2004, ch. 21, § 1, p. 86.) Therefore, according to Walnut, students who departed Rowland prior to 2004 cannot be counted toward the 10 percent durational cap.

■    Because this belated contention by Walnut presents a pure question of law, and the proper interpretation of section 48307, subdivision (b) is a matter of public interest, we exercise our discretion to address the issue. (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 406, pp. 464–466.)

Although the original District of Choice legislation was recodified in 2004, the Legislature has recognized the District of Choice program was established in 1993, not in 2004. For example, the bill analysis of Senate Bill 680 as introduced on February 27, 2009, for the Senate Committee on Education's April 15, 2009 hearing provides, at page 2: *"The School Districts of Choice authorization for interdistrict transfers was initially established by AB 19 (Quackenbush), Chapter 160 of 1993.* The statute was re-authorized in 2004 by AB 19 (Nation, Chapter 21) which extended the statute until July 1, 2007." (Italics added.)

Likewise, the bill analysis from the Assembly Committee on Appropriation's July 15, 2009 hearing on Senate Bill 680 refers to Assembly Bill No. 19 (1993–1994 Reg. Sess.) in 1993 as the initial authorizing legislation for the District of Choice program. (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 680 (2009–2010 Reg. Sess.) as amended June 24, 2009, pp. 3–4.)

Thus, although the District of Choice legislation repeatedly has been reauthorized and extended since its inception, the District of Choice program commenced with Assembly Bill No. 19 (1993–1994 Reg. Sess.) in 1993, not with Assembly Bill No. 97 (2003–2004 Reg. Sess.) in 2004.

Further, the current durational cap in section 48307, subdivision (b) is identical to the durational cap contained in the original legislation. Former section 48209.7, subdivision (b), stated: "A school district of residence with average daily attendance less than 50,000 may limit the number of pupils transferring out to 3 percent of its current year estimated average daily attendance *and may limit the maximum number of pupils transferring out for the duration of the program authorized by this article to 10 percent of the average daily attendance for that period.*" (Stats. 1993, ch. 160, § 1, p. 1445, italics added.) This italicized language from the 1993 legislation is continued verbatim in current section 48307, subdivision (b).

■    Therefore, the "duration of the program authorized by this article" (§ 48307, subd. (b)), refers to the original inception date of the District of Choice program, not to its later recodification.

f. *Conclusion regarding interpretation of section 48307, subdivision (b).*

■ In sum, the trial court properly held the 10 percent cap on outbound transfers (§ 48307, subd. (b)) is based on Rowland's average daily attendance for the entire duration of the District of Choice program.

4. *Substantial evidence supports trial court's factual determination Rowland has reached the 10 percent cap so as to enable it to prohibit any further outbound transfers under the District of Choice program.*

The next issue is whether the trial court properly found Rowland has reached the 10 percent cap so as to entitle Rowland to prohibit any further outbound transfers under the District of Choice program.

Whether 10 percent of Rowland's average daily attendance for the duration of the District of Choice program has transferred out is a question of fact. Therefore, we review the trial court's determination in this regard for substantial evidence. (*Committee for Responsible School Expansion v. Hermosa Beach City School Dist., supra,* 142 Cal.App.4th at p. 1184.)

The record reflects Rowland's average daily attendance for the duration of the District of Choice Program, during the years 1995 through 2009, was 17,527.60. Therefore, Rowland was entitled to limit the maximum number of students transferring out for the duration of the program to 10 percent of that figure, or 1,752.76 students.

As the trial court noted, the third party independent review of Dr. Rudy Castruita determined that over the years, 1,940 students had transferred from Rowland to Walnut under the District of Choice program. In addition, 114 students had transferred from Rowland to Hacienda La Puente Unified School District pursuant to said program. Thus, a total of 2,054 students already had departed Rowland under the program.

Walnut argued the independent consultant only reviewed applications and not actual transfers. However, the trial court rejected this contention, stating, "The court cannot conclude that the consultant *only* reviewed applications."

This court cannot reweigh the evidence. We defer, as we must, to the trial court's determination the Castruita report established Rowland had reached the 10 percent cap. Therefore, at this juncture, Rowland is entitled to preclude

any more students residing in said district from transferring out of their district of residence under the District of Choice program. (§ 48307, subd. (b).)[10]

### 5. *Remaining issues not reached.*

In view of our conclusion Rowland has reached the 10 percent cap on outbound transfers, so as to entitle it to preclude any further outbound transfers under the District of Choice program, it is unnecessary to address whether Rowland also has a fiscal justification for refusing any more outbound transfers (§ 48307, subd. (d)), or any other issues.

## DISPOSITION

Walnut's petition for writ of mandate is denied. Rowland shall recover its costs in this proceeding. (Cal. Rules of Court, rule 8.936.)

Kitching, J., and Aldrich, J., concurred.

---

[10] We note Walnut is free under the District of Choice program to accept transfers of students from other school districts which, unlike Rowland, have not met the 10 percent durational cap. (§ 48307, subd. (b).) It would appear the vast majority of school districts in California have not yet attained the 10 percent cap on outbound transfers.